DAVID G. CLAYTON AND BARBARA A. CLAYTON, ET AL.,[1]
PETITIONERS v. COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket Nos. 9566–91, 12929–91, 12978–91.          Filed April 18, 1994.

[1] Cases of the following petitioners are consolidated herewith: David G. Clayton, docket No. 12929–91, and Barbara A. Clayton, docket No. 12978–91.

David G. Clayton and Barbara A. Clayton, pro se.
*Dale A. Zusi* and *Steven A. Wilson,* for respondent.

NIMS, *Judge:* In these consolidated cases respondent determined income tax deficiencies and additions to tax as follows:

*Taxable Year 1989*

| Petitioners | Deficiency | Addition to tax sec. 6663(a) |
|---|---|---|
| David G. Clayton and Barbara A. Clayton | $32,598 | $24,449 |

(Except as otherwise noted, all section references are to sections of the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.)

For 1989, respondent's answer asserts, in the alternative to the addition to tax under section 6663(a), a 20-percent addition to tax under section 6662.

*Taxable Year 1990*

| Petitioner | Deficiency | Additions to tax | |
|---|---|---|---|
| | | Sec. 6651(f) | Sec. 6654 |
| David G. Clayton | $18,549 | $2,580 | $1,097 |
| Barbara A. Clayton | 17,559 | 2,432 | 1,033 |

As to David G. Clayton (petitioner) for 1990, respondent's answer asserts, in the alternative to the addition to tax

under section 6651(f), a 25-percent addition to tax under section 6651(a), and, in the alternative to the addition to tax under section 6651(f) or section 6651(a), a 75-percent addition to tax under section 6663.

As to Barbara A. Clayton (Mrs. Clayton) for 1990, respondent's answer asserts, in the alternative to the addition to tax under section 6651(f), a 25-percent addition to tax under section 6651(a), and, in the alternative to the addition to tax under section 6651(f) or section 6651(a), a 75-percent addition to tax under section 6663.

As to both petitioners, respondent also asserts, in the alternative to the foregoing, additions to tax under section 6662(b)(1) and (2).

At trial, respondent made a concession as to the amount of the deficiency for both petitioners for 1990 based upon a "wagering season" of 24 weeks rather than 26 weeks. Respondent also conceded the fraud issue as to Mrs. Clayton.

The issues for decision are:

(1) Whether petitioners received unreported taxable income in 1989;

(2) whether petitioners received unreported taxable income in 1990;

(3) whether petitioner received unreported interest income in 1990 in the amount of $3,016;

(4) whether petitioner fraudulently and with intent to evade tax failed to report taxable income received from bookmaking activities in 1989;

(5) in the alternative whether, for purposes of section 6662(b)(1), petitioners' underpayment of tax for 1989 is attributable to negligence or disregard of rules and regulations, or, for purposes of section 6662(b)(2), constitutes a substantial understatement of income tax;

(6) whether, for purposes of section 6651(f), petitioner fraudulently failed to file an income tax return for 1990;

(7) in the alternative to section 6651(f) for 1990, whether, for purposes of section 6651(a), petitioners' failure to file a timely return for 1990 was due to willful neglect;

(8) in the alternative to sections 6651(f) and 6651(a), whether for 1990 petitioner, for purposes of section 6663, fraudulently and with intent to evade tax failed to report taxable income received from bookmaking activities;

(9) in the alternative to section 6651(f), 6651(a), and section 6663(a) for 1990, whether, for purposes of section 6662(b)(1), petitioners' underpayment of tax for 1990 is attributable to negligence or disregard of rules or regulations, or, for purposes of section 6662(b)(2), constitutes a substantial understatement of income tax;

(10) whether petitioners are liable for the addition to tax pursuant to section 6654 for failing to make sufficient estimated tax payments for 1990.

Mrs. Clayton concedes that she received unreported interest income in 1990 in the amount of $50.

### FINDINGS OF FACT

Petitioners resided at 5114 Montecito Drive, Bakersfield, California (petitioners' residence) when they filed their petitions in this case. Their 1989 joint return was timely filed.

On January 27, 1991, petitioners' residence was raided by officers of the Bakersfield, California, Police Department and the Criminal Investigation Division of the Internal Revenue Service. Simultaneously, the Bakersfield police also raided the residence of Michael Martini, Sr. (Martini), at 4213 McKelvey Court in Bakersfield (the Martini residence).

At both premises the police officers discovered and seized miscellaneous bookmaking paraphernalia and wagering records. These included "pay and collect" sheets, a "proposition bets" sheet, a "top sheet", $4,845 in cash, several books relating to bookmaking, and miscellaneous other items. At petitioners' residence the police discovered four telephones in close proximity to each other.

One of the Bakersfield police officers searching petitioners' residence found evidence that calls from petitioners' telephones were capable of being forwarded to a telephone at the Martini residence. Next to one of the telephones the police officer found an envelope with a phone number belonging to petitioner written on it. Also written on the envelope was a note stating that petitioner's phone number was "on", with a small arrow drawn to a second phone number, which belonged to Martini.

At the Martini residence the officers found various items relating to bookmaking in a room that appeared to be an office. One of the telephones in the "office" at the Martini

residence had a speed dialing feature with the ability to store several numbers. Petitioner's initials, "DC", were marked in red ink on one of those numbers. Out of approximately 14 numbers on the speed dial phone, only two were marked in red. .

One of the Bakersfield police officers who was searching the Martini residence pressed the number marked "DC" and made telephonic contact with a police officer who was at petitioners' residence. A police officer seized 11 audio cassette tapes at the Martini residence containing the voices of Martini and petitioner accepting wagers over the telephone.

By going through bank records seized at petitioners' residence, the police discovered that petitioners held two safe deposit boxes in Bakersfield, California, and one in Salinas, California. The police seized $31,080 in U.S. currency from petitioners' safe deposit box number 645 at First Interstate Bank, 456 South Main Street, Salinas, California, and $12,800 in U.S. currency, and cashier's checks and money orders totaling $11,815, from petitioners' safe deposit box 434 at California Republic Bank, 3743 Columbus Street, Bakersfield, California. The police also seized $33,074 in U.S. currency and a receipt for a cashier's check in the name of Mrs. Clayton in the amount of $25,000 from safe deposit box number 319 in petitioners' name at California Republic Bank, 246 Bernard Street, Bakersfield, California.

At the time of the raid the police arrested petitioners on charges of bookmaking, recording a wager, and allowing a location for bookmaking. Criminal charges against petitioners under California law were subsequently dismissed by the California Superior Court.

Petitioner received a 10-percent commission, called "vigorish", from losing bettors on bets other than parlays (in a parlay a bettor makes a combined bet on several games and must win as to all games). The top sheet and the pay and collect sheet seized by the police in the raid were related. The seized pay and collect sheet was for the week represented by the seized top sheet. The bettor names and account numbers matched on both items, and the figures from the top sheet matched the figures on the pay and collect sheet. (A top sheet serves as an accounts receivable and accounts payable sheet. A pay and collect sheet transfers information from the top sheet to the pay and collect sheet

which is then used by the bookmaker to collect moneys owed to the bookmaker, and pay out moneys owed to the bettor.)

The records seized from petitioners' residence and from the Martini residence were part of the same bookmaking operation. Petitioner and Martini tape-recorded the bets they took over the phone in the bookmaking operation. For the most part petitioner systematically destroyed the underlying records for his bookmaking operation.

In 1989, petitioner took bets on professional and college football games. In 1990, petitioner and Martini took bets on professional and college football games as well as on boxing matches.

Respondent's agent concluded that the records seized from petitioners' residence and the Martini residence were not sufficient by themselves to determine income for petitioner's bookmaking operation for the entire years 1989 and 1990. Consequently, the agent decided to use the so-called profit-factor method, an indirect method of computing income, to compute the amount of income that petitioners received in 1989 and 1990 from the bookmaking operation.

The profit-factor method employed by the agent calculates the average income over an entire betting season rather than the specific income received during any particular week. Therefore, identifiable, datable records were needed. The agent found a period of time for which he believed he could date the few records left undestroyed and calculate the volume of wagers on those records.

The records the agent used were records involving two professional football conference championship games played on January 14, 1990. These were the American Football Conference Championship game between the Cleveland Browns and the Denver Broncos, and the National Football Conference Championship game between the Los Angeles Rams and the San Francisco 49'ers. The revenue agent considered petitioners' records of bets on these games to be the most reliable records that he could find among the few records available. Even though the bets reflected only a single day's wagering, the agent took the bets on these games to encompass an entire week's wagering. Based upon the 1 day's betting records, the revenue agent calculated that petitioners received unreported income from petitioner's bookmaking

operation of $79,640 in 1989 and $95,571 from the book-making operations in 1990. His methodology was as follows.

The agent found that as petitioner took down individual bets on "betting markers", he also recorded them on an over-age sheet to show him how he was doing with all of his bet-tors. (A betting marker is the first document created when a bet is placed. The bookmaker records the bet on the betting marker, indicating the bettor's number, the game bet on, the point spread, and the amount of the bet.) As all of the bets on the conference championship football games were reported on the overage sheet, the overage sheet provided a complete document reflecting the betting on the two championship games. On the overage sheet, the numbers under each team represented the bets placed on those teams. The revenue agent totaled these numbers to determine the total amount of bets placed on those two games on January 14, 1990, which came to $87,600. The publication "America's Gaming Gazette", seized from petitioner's residence, described a book-maker's profit as 4½ percent, which the agent utilized for purposes of his computations.

After the revenue agent computed petitioner's average weekly gross wagers to be $87,600, he multiplied this figure by the 4½ percent profit factor and arrived at what he deemed to be petitioner's average net weekly income, or $3,981.

Based upon his profit-factor analysis, the revenue agent concluded that in 1989 petitioners received unreported income from petitioner's bookmaking operation in the amount of $79,640. To arrive at the $79,640 unreported income figure for 1989, the revenue agent used the $3,981 average net weekly income figure previously calculated. He then multiplied this figure by 20 weeks, the number of weeks in the 1989 professional football season (4 weeks of exhi-bition games plus 16 weeks of regular season games).

The revenue agent used the same methodology to calculate the 1990 bookmaking income, except that he based his com-putations on a 26-week season rather than a 20-week season. On this basis he concluded that in 1990 petitioners received unreported income from petitioner's bookmaking operation in the amount of $95,571. (As noted previously, respondent con-cedes that a 24-week rather than a 26-week season should have been used for 1990.)

In connection with his analysis of the January 14, 1990, betting records seized at petitioners' residence, the revenue agent made an analysis of the bets on the championship games which involved vigorish. The following chart is based upon the revenue agent's analysis:

*Final scores:*

San Francisco 30—Los Angeles 3
Denver 37—Cleveland 21

|  | Amounts bet | To book |
|---|---|---|
| *Full game spreads:* | | |
| Cleveland +4 | $12,800 | $14,080 |
| Denver –3 | 11,200 | (11,200) |
| Los Angeles +7 | 12,900 | 14,190 |
| San Francisco –7 | 18,700 | (18,700) |
| Cleveland-Denver over 40 | 4,500 | (4,500) |
| Cleveland-Denver under 40 | 1,100 | 1,210 |
| Los Angeles-San Francisco over 46 | 4,500 | 4,950 |
| Los Angeles-San Francisco under 46 | 2,600 | (2,600) |
| *Half-time point spreads:* | | |
| Cleveland –4 | 2,700 | 2,970 |
| Denver +4 | 2,500 | (2,500) |
| *Type of bet:* | | |
| Over 23 | 800 | (800) |
| Under 23 | 2,300 | 2,530 |
| *Point spreads:* | | |
| Los Angeles +7 | 3,900 | 4,290 |
| San Francisco –7 | 5,300 | (5,300) |
| *Type of bet:* | | |
| Over ? | 1,700 | 1,870 |
| Under ? (?9) | 100 | (100) |
| Net profit | | 390 |

The numbers in parentheses in the "To book" column reflect the bets which petitioner lost; i.e., bets which the bettors won and which petitioner had to pay off. The numbers not in parentheses in the "To book" column include 10 percent vigorish.

Thus, since Cleveland and Los Angeles failed to beat their point spreads, the bettors on Cleveland and Los Angeles lost their bets, and petitioner collected vigorish on those bets. The chart reflects that at the end of the day, based upon petitioner's records as analyzed by the revenue agent, petitioner had a net profit of $390 from bets on which he charged vigorish. According to another part of the revenue agent's analysis petitioner had winnings of $3,250 from parlay bets on the two games played on January 14, 1990, but the agent disregarded these bets, on which there was no vigorish, in making his profit-factor analysis.

The revenue agent assumed that petitioner was taking bets in 1989 because identifiable records for 1989 were seized in the January 27, 1991, raid, consisting of a phonograph album cover on which were written point spreads for three games next to a date of "9/12/89", and an audio tape on which a recorded conversation referred to betting activity by one of petitioner's "clients" with petitioner in 1989.

Billy Joe McKenzie, a captain in the Kern County, California, Fire Department, was an acquaintance of petitioner in 1989 and 1990. McKenzie placed approximately $10,000 in bets with petitioner's bookmaking operation in 1989. McKenzie also placed approximately $5,000 in bets with petitioner's bookmaking operation in 1990.

The revenue agent also prepared a bank deposits analysis of petitioners' bank accounts for 1989 and 1990 to corroborate his calculations of petitioners' income under the profit-factor method. To make the calculations the agent obtained by summons the records of all of petitioner's known bank accounts, which included bank statements, checks written on each account, and deposits and related documents for each deposit. The agent identified the nature of all deposits, made a schedule of the checks and currency involved in the deposits, and listed the accounts to which the deposits were made. He also attempted to identify any transfers between accounts, and any other sources of deposits that might have been available in the remainder of the records seized from petitioner's residence. The record contains no evidence that petitioners furnished the revenue agent with any leads as to nontaxable sources of bank deposits.

The agent then netted the deposits against income reported on the 1989 tax return and the 1990 joint return

filed late by petitioners, and also any other deposits that could be explained from the records seized at petitioner's residence, specifically including the sale of a residence in 1989. The agent made the same type of analysis for both of the years in question.

The revenue agent's bank deposits analysis resulted in the following unexplained deposits, which he treated as unreported income:

### 1989

| | |
|---|---|
| Bank deposits net of transfers | $181,495 |
| Income per 1989 return | 126,501 |
| Unexplained deposits | 54,994 |

### 1990

| | |
|---|---|
| Bank deposits net of transfers | 94,723 |
| Income per 1990 return | 77,814 |
| Unexplained deposits | 16,909 |

The IRS has no record of receiving Form 730, Tax on Wagering, for a substantial number of quarterly periods during 1989 and 1990. Petitioners did not file Form 11–C, Stamp Tax and Registration Return for Wagering, during 1989 and 1990.

On January 29, 1991, respondent made termination assessments under section 6851(a) against each petitioner for 1990. On May 2, 1991, pursuant to section 6020(b), respondent prepared and executed separate substitute Forms 1040, U.S. Individual Income Tax Return, for each petitioner for the taxable year 1990. These returns reflected petitioners' filing status as married filing separately. On June 7, 1991, respondent sent separate deficiency notices to petitioners, in response to which petitioners filed two of the three petitions in this case.

On April 15, 1991, petitioners filed with the IRS Form 4868, Application for Automatic Extension of Time to File U.S. Individual Income Tax Return, reflecting zero tax liability for 1990. On August 15, 1991, they filed Form 2688, Application for Additional Extension of Time to File U.S. Individual Income Tax Return, requesting an extension to October 15, 1991. Under "Explain why you need an exten-

sion" they put "Taxpayer [sic] has an appeal pending before Appeal's Office in Fresno, California. The results will effect [sic] the filing of taxpayer's [sic] 1990 Tax Return." Petitioners filed a joint return on October 15, 1991, which was within the time putatively extended by Forms 4868 and 2688. The Form 2688 was stamped "EXTENSION TO FILE APPROVED" by the Fresno Service Center.

## OPINION

In determining petitioners' unreported income for 1989 and 1990, respondent extrapolated from records reflecting part of petitioner's activity for only one day early in 1990. Therefore, respondent assumed that it was incumbent upon her to establish that petitioner also actually engaged in wagering activity in 1989, applying *Weimerskirch v. Commissioner,* 596 F.2d 358, 361 (9th Cir. 1979), revg. 67 T.C. 672 (1977). To establish petitioner's 1989 bookmaking activity respondent produced a witness, Billy Joe McKenzie, a captain of the Kern County, California, Fire Department, who testified that he placed bets with petitioner of around $10,000 in 1989 and $5,000 in 1990. We found McKenzie's testimony to be credible. Also, on one of the cassette tapes seized at the Martini residence the caller said: "this is Jerry from Salinas Quality Market. Remember I played with you last year. I played a lot of teasers," to which petitioner replied: "yeah, yeah, I do remember you." Since the caller went on to place a bet on a game played in 1990, the reference to "last year" had to be to 1989. We hold that this evidence is sufficient to establish that petitioner was engaged in bookmaking activity in 1989.

Respondent calculated petitioners' unreported bookmaking income by the so-called profit-factor method. Using records seized in the January 27, 1991, police raid on petitioners' and Martini's residences, respondent's agent was able to reconstruct all bets petitioner took on the two National Football League championship football games played on January 14, 1990, on which petitioner charged a 10-percent commission, or "vigorish", to the losing bettor. These games were played between the Denver Broncos and the Cleveland Browns for the American Football Conference Championship, which Denver won by a score of 37 to 21, and the Los Angeles Rams and the San Francisco 49'ers for the National

Football Conference Championship, which San Francisco won by a score of 30 to 3. The agent totaled all of these bets—winners and losers—and came up with a figure of $87,600 exclusive of vigorish.

For purposes of the computation respondent equated this $87,600 to the wagers of an average week during the betting season. The average weekly gross wagers thus derived was then multiplied by a postulated profit percentage or factor of 4½ percent to determine petitioner's net weekly income, resulting in a figure of $3,981. Theoretically, and assuming that a bookmaker's books are exactly in balance, the 4½-percent profit percentage used by respondent can be calculated mathematically from the fact that if a bookmaker accepts two $100 bets on the same game, one on each side, he will take in $220 in wagers: $200 plus $20 vigorish. He will then pay the winner $210 ($110 for the original wager plus winnings of $100) and retain the remaining $10 as his profit. The profit divided by the total wagers equals the profit percentage ($10 ÷ $220 = .04545 or 4.5 percent).

After making the above calculation, the $3,981 net weekly income thus derived was multiplied by the number of weeks in which bets were postulated to have been taken: 20 weeks in 1989 and 24 weeks in 1990. (The computation in the 1990 statutory notices was based on a 26-week season, but respondent concedes that the season was only 24 weeks long and that the computation should be reduced accordingly.) Thus, respondent's agent extrapolated 2 years' income from part of 1 day's betting on the near apogee of the 1989 professional football season. As already noted, the agent disregarded parlay bets on the same games.

Respondent's agent testified that he attempted to apply the rationale of the *DiMauro* case" to this case, since petitioners had destroyed most of their records. In *DiMauro v. United States,* 706 F.2d 882, 885 (8th Cir. 1983), the Court of Appeals stated that when a taxpayer destroys his tax records, the Commissioner's method of determining tax liability need not be arithmetically precise; it need only be reasonable. We do not think respondent's application of the profit-factor method in this case was reasonable.

In the *DiMauro* case, the taxpayer was alleged to have understated his wagering excise tax liability, and the IRS utilized the profit-factor method to establish the correct amount

of wagers on which this liability could be computed. *DiMauro v. United States,* 81–2 USTC par. 16,373 (D. Neb. 1981), affd. 706 F.2d 882 (8th Cir. 1983). The revenue agent in *DiMauro* estimated the taxpayer's total wagers upon which the excise tax was to be assessed by multiplying by 20 the net income shown on Schedule C of the taxpayer's income tax return. (In a footnote the District Court explained that the revenue agent used a factor of 5 percent rather than 4.5 percent which resulted in a lower estimate of total wagers than would the use of 4.5 percent; i.e., a more conservative approach.)

The District Court in *DiMauro* noted that the taxpayer's description of his own bookmaking operation suggested that his profits were usually 4.5 percent of the total amount of wagers accepted. *DiMauro v. United States,* 81–2 USTC par. 16,373, at 88,878. Thus, the taxpayer's own admission as to the profit margin of his operation, plus the fact that the profit factor was applied to a year's net income as reported by the taxpayer on his income tax return, would seem to wholly justify the conclusion by both the District Court and the Court of Appeals that respondent's use of the profit-factor method in *DiMauro* was reasonable.

In the case before us the profit-factor method was, of course, used for a different purpose, namely, to determine wagering income for income tax purposes rather than the amount of taxable wagers for excise tax purposes. We have approved the use of the profit-factor method to determine income from wagering in another case, namely, *Robinson v. Commissioner,* T.C. Memo. 1986–382. (3 years' wagers extrapolated from 17 days' records and multiplied by 4.55 percent.) However, we believe that respondent's use of the profit-factor method in the case before us is too theoretical to be reliable, and therefore is not reasonable.

We find respondent's equating part of 1 day's very active wagering on two high profile games to 46 weeks of wagering (covering 1989 and 1990) extremely unrealistic. Furthermore, respondent's own analysis of petitioner's actual profit from the two games reveals that petitioner's profit came to only $390, about 10 percent of the $3,981 profit hypothesized by the profit-factor percentage. As exemplified in our findings of fact, respondent arrived at the $390 figure by netting all of the bets which petitioner won, and on which he collected

vigorish, against all of the bets he lost, and on which did not collect vigorish. If petitioner's actual profit, rather than respondent's hypothetical profit, were equated to 1 week's wagers under respondent's methodology, the 46-week income from wagers would, of course, be substantially reduced.

Respondent argues that petitioner may have balanced his books by laying off bets with other bookmakers, but the revenue agent testified that he did not remember seeing any direct evidence of laying off. We also note that the transactions relied upon by respondent reflect no effort by petitioner to even his books by adjusting the point spread, even though there was heavy betting on the game favorites, Denver and San Francisco. As a matter of fact, respondent's analysis of the available betting records reflected $3,750 in winnings from parlay bets, and only $500 in losses, or net winnings of $3,250. Respondent, however, chose to disregard these bets, presumably because they did not involve vigorish, and did not therefore jibe with the 4.5-percent profit-factor theory.

The revenue agent also made a bank deposits analysis for 1989 and 1990, which we have described in our findings of fact. Respondent's counsel stated that "we believe that the bank deposits [method] is a more conclusive method of proving income than the extrapolation", and insofar as this case is concerned, we certainly agree.

The use of the bank deposits method for computing unreported income has long been sanctioned by the courts. *DiLeo v. Commissioner,* 96 T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992). When a taxpayer keeps no books or records and has large bank deposits, the Commissioner is not arbitrary or capricious in resorting to the bank deposits method of computing income. *Id.*

Bank deposits are prima facie evidence of income, *Tokarski v. Commissioner,* 87 T.C. 74, 77 (1986), and the taxpayer has the burden of showing that the determination is incorrect, *Estate of Mason v. Commissioner,* 64 T.C. 651, 657 (1975), affd. 566 F.2d 2 (6th Cir. 1977). In such case the Commissioner is not required to show a likely source of income, *id.,* although here she has done so. The bank deposits method assumes that all money deposited in a taxpayer's bank account during a given period constitutes taxable income, but the Government must take into account any nontaxable

source or deductible expense of which it has knowledge. *DiLeo v. Commissioner,* 96 T.C. at 868.

Respondent's agent scheduled all checks and currency deposited in petitioners' bank accounts. He also eliminated all transfers and identified as far as possible all sources of deposits, including specifically the proceeds of the sale of a residence in 1989, which was reported on petitioners' 1989 return. The agent then totaled the bank deposits net of transfers for each year and subtracted the income as reported on petitioners' 1989 tax return and the delinquent 1990 return. These computations produced unexplained deposits of $54,994 for 1989 and $16,909 for 1990. Under respondent's application of the bank deposits method these amounts are assumed to be unreported taxable income, and we so hold.

Petitioners argue without any supporting evidence that respondent has included approximately $27,000 in deposits in 1989 which, they claim, properly belongs in 1990. The revenue agent's list of deposits negates petitioners' contention.

Respondent determined that petitioner had received $3,016 in interest income in 1990 which was unreported. The revenue agent's analysis notes that no interest was identified or included in 1990 bank deposits. Since petitioners have introduced no evidence on this issue, as to which they have the burden of proof, we sustain respondent's determination.

As previously noted, respondent has conceded that Mrs. Clayton is not liable for the addition to tax for fraud under section 6663 or for fraudulent failure to file under section 6651(f). Accordingly, the discussion of fraud which follows relates only to petitioner David G. Clayton and not to Mrs. Clayton.

In any case involving the issue of fraud with intent to evade tax, the burden of proof in respect of that issue is on the Commissioner, and that burden of proof is to be carried by clear and convincing evidence. Sec. 7454(a); Rule 142(b). To establish the existence of fraud in this case, respondent must prove by clear and convincing evidence that petitioner underpaid his income tax and that some part of the underpayment was due to fraud. *Recklitis v. Commissioner,* 91 T.C. 874, 909 (1988).

Fraud is established by proving that a taxpayer intended to evade tax believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such tax. Respondent need not establish that tax evasion was a primary motive of the taxpayer, but may satisfy the burden by showing that a tax-evasion motive played any part in the taxpayer's conduct, including conduct designed to conceal another crime. *Recklitis v. Commissioner,* 91 T.C. at 909.

While we have rejected respondent's application of the profit-factor method in reconstructing petitioner's unreported income for the 2 years in question, we are satisfied that respondent's bank deposits analysis establishes that petitioners had substantial unreported income in those years. Respondent has thus established an underpayment in each year.

Fraudulent intent may be established by circumstantial evidence and reasonable inferences drawn from the record. *Stoltzfus v. United States,* 398 F.2d 1002, 1005 (3d Cir. 1968). In *Bradford v. Commissioner,* 796 F.2d 303, 307–308 (9th Cir. 1986), affg. T.C. Memo. 1984–601, the U.S. Court of Appeals for the Ninth Circuit articulated a nonexclusive list of factors which demonstrate fraudulent intent. These "badges of fraud" include: (1) Understating income, (2) maintaining inadequate records, (3) failing to file tax returns, (4) giving implausible or inconsistent explanations of behavior, (5) concealing assets, (6) failing to cooperate with tax authorities, (7) engaging in illegal activities, (8) attempting to conceal illegal activities, (9) dealing in cash, and (10) failing to make estimated tax payments.

Many of the foregoing badges of fraud are present in this case. Petitioners had a 2-year pattern of failing to report substantial income from petitioner's bookmaking activities. Petitioner failed to maintain adequate records of his bookmaking activities, and in fact consistently destroyed on a contemporaneous basis documents that would have evidenced bookmaking income. Petitioners' various bank accounts reveal a steady flow of check and currency deposits, yet petitioner maintained no records of these substantial sums. Copies of the bank records were obtained, not from petitioners, but by subpoena from the banks.

The source of petitioner's unreported income was, of course, itself an illegal activity. (We note that while criminal

648

charges against petitioner were dropped, presumably because of defective search warrants, there is ample evidence for purposes of this case that petitioner was engaged in an illegal bookmaking activity.) The fact that petitioners may have been reluctant to report this income does not preclude a tax-evasion motive on the part of petitioner. *Recklitis v. Commissioner,* 91 T.C. at 909.

For the foregoing reasons, we conclude that respondent has sustained her burden of proof on the issue of fraud, and we sustain the addition to tax for fraud under section 6663(a) for 1989.

For 1990, respondent determined that petitioners are liable for the addition to tax under section 6651(f) for fraudulent failure to file, but, as stated, has conceded this issue as to Mrs. Clayton.

Section 6651(f) provides:

SEC. 6651(f). INCREASE IN PENALTY FOR FRAUDULENT FAILURE TO FILE.—If any failure to file any return is fraudulent, paragraph (1) of subsection (a) shall be applied—

(1) by substituting "15 percent" for "5 percent" each place it appears, and

(2) by substituting "75 percent" for "25 percent".

Section 6651(a)(1) provides in relevant part:

SEC. 6651. FAILURE TO FILE TAX RETURN OR TO PAY TAX.

(a) ADDITION TO THE TAX.—In case of failure—

(1) to file any return required under authority of subchapter A of chapter 61 * * * on the date prescribed therefor *(determined with regard to any extension of time for filing),* unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate; [Emphasis added.]

For reasons discussed below, respondent determined that petitioner is liable for a 15-percent, rather than a 75-percent, addition to tax under section 6651(f).

As reflected in our findings of fact, respondent made a termination assessment against each petitioner for 1990 on January 29, 1991. With regard to termination assessments, section 6851 provides in relevant part:

SEC. 6851. TERMINATION ASSESSMENTS OF INCOME TAX.

(a) AUTHORITY FOR MAKING.—

(1) IN GENERAL.—If the Secretary finds that a taxpayer designs * * * to do any * * * act * * * tending to prejudice or to render wholly or partially ineffectual proceedings to collect the income tax for the current or the immediately preceding taxable year unless such proceeding be brought without delay, the Secretary shall immediately make a determination of tax for the current taxable year or for the preceding taxable year, or both, as the case may be, and notwithstanding any other provision of law, such tax shall become immediately due and payable. The Secretary shall immediately assess the amount of the tax so determined (together with all interest, additional amounts, and additions to the tax provided by law) for the current taxable year or such preceding taxable year, or both, as the case may be, and shall cause notice of such determination and assessment to be given the taxpayer, together with a demand for immediate payment of such tax.

* * * * * * *

(b) NOTICE OF DEFICIENCY.—If an assessment of tax is made under the authority of subsection (a), the Secretary shall mail a notice under section 6212(a) for the taxpayer's full taxable year (determined without regard to any action taken under subsection (a)) with respect to which such assessment was made within 60 days after the later of (i) the due date of the taxpayer's return for such taxable year (determined with regard to any extensions), or (ii) the date such taxpayer files such return. Such deficiency may be in an amount greater or less than the amount assessed under subsection (a).

Section 1.6851–(a)(3), Income Tax Regs., provides in relevant part:

(3) Taxable Year Not Affected By Termination. Notwithstanding any termination assessment a taxpayer shall file a return in accordance with section 6012 and the regulations thereunder for the taxpayer's full taxable year. The term "full taxable year" means the taxpayer's usual annual accounting period determined without regard to any action under section 6851 and this section. The return shall show all items of gross income, deductions, and credits for such taxable year. * * *

Section 6020(b) provides:

SEC. 6020(b). EXECUTION OF RETURN BY SECRETARY.—

(1) AUTHORITY OF SECRETARY TO EXECUTE RETURN.—If any person fails to make any return required by any internal revenue law or regulation made thereunder at the time prescribed therefor, or makes, willfully or otherwise, a false or fraudulent return, the Secretary shall make such return from his own knowledge and from such information as he can obtain through testimony or otherwise.

(2) STATUS OF RETURNS.—Any return so made and subscribed by the Secretary shall be prima facie good and sufficient for all legal purposes.

Thus, to recapitulate, respondent made termination assessments under section 6851. Then, apparently proceeding upon the assumption that petitioners' initial application for an extension of time was invalid, and that petitioners had therefore failed to comply with the requirement of the above-quoted regulation that they file a return by April 15, 1991, respondent made substituted returns for petitioners and mailed deficiency notices based upon them. Section 6851(b), quoted above, requires respondent to mail a deficiency notice for the taxpayer's full taxable year (without regard to the termination assessment) within 60 days *after the later of* "(i) the due date of the taxpayer's return for such taxable year (determined *with* regard to any extensions), or (ii) the date such taxpayer files such return." (Emphasis added.) Respondent mailed the 1990 deficiency notices to petitioners on June 7, 1991, which was within 60 days after the May 2, 1991, date on which respondent made petitioners' substituted returns.

In *Crocker v. Commissioner,* 92 T.C. 899, 906 (1989), we considered the applicability of the addition to tax for failure to timely file in a situation where, on Forms 4868, the taxpayers underestimated their true 1981 tax liability by approximately $58,000 and their true 1982 tax liability by approximately $27,000. We agreed with the Commissioner in that case that the Forms 4868 were invalid and the extensions received thereon void from the beginning because of the taxpayers' failure to properly estimate their tax liability as required by section 1.6081–4(a)(4), Income Tax Regs. For this reason, we held that the taxpayers were required, under 6072(a), to file their respective returns by April 15 in each of the succeeding years, which they failed to do. *Id.*

At this point we perceive our task to be two-fold: To determine (1) whether petitioners' applications for an extension of time to file on Forms 4868 and 2688 are valid; and (2) if our answer to (1) is in the negative, whether petitioners are to be deemed to have failed to file a return for 1990 and if so, whether there was a fraudulent failure to file by petitioners as envisioned by section 6651(f).

In *Crocker v. Commissioner, supra,* we made a detailed explication of section 1.6081–4, Income Tax Regs., relating to applications for extensions of time within which to file income tax returns, and no useful purpose would be served

by reiterating that discussion here. On the Form 4868 which petitioners filed in this case on April 15, 1991, they estimated their total tax liability for 1990 to be zero. Section 1.6081–4(a)(4), Income Tax Regs., requires that the application show the full amount properly estimated as tax for the taxable year. Petitioners were well aware of the substantial 1990 income from wagering when they filed Form 4868. Furthermore, when they ultimately filed Form 1040 for 1990 on October 15, 1991, they reported substantial income from nonwagering sources which they must have been aware of when they filed Form 4868 on April 15, 1991. On their Form 1040 for 1990 petitioners reported a tax liability of $11,898, a figure at substantial odds with the zero tax liability estimated on Form 4868.

The Form 4868 which petitioners filed carries on its face the following warning:

Total tax liability for 1990. This is the amount you expect to enter on line 27 of Form 1040A, or line 54 of Form 1040. If you do not expect to owe tax, enter zero (-0-) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Caution: You MUST enter an amount on line 1 or your extension will be denied. You can estimate this amount; but be as exact as you can with the information you have. If we later find that your estimate was not reasonable, the extension will be null and void.

To report zero estimated tax liability on Form 4868 was a blatant disregard by petitioners of the requirements for obtaining a valid extension of time, and invalidates the automatic extension otherwise available through Form 4868. Since petitioners' initial extension was a nullity from the beginning, the subsequently filed Form 2688 and the further extension granted on it were likewise a nullity. We accordingly hold that for purposes of section 6651(a), petitioners' 1990 return was not timely filed.

We now turn to the question of whether such failure to file was fraudulent under section 6651(f). Section 7741(a) of the Omnibus Budget Reconciliation Act of 1989 (OBRA), Pub. L. 101-239, 103 Stat. 2106, 2404–2405, added subsection (f) to section 6651, effective in cases of failure to file returns the due date for which (determined without regard to extensions) is after December 31, 1989. Section 6651(f) is thus applicable to petitioners' 1990 tax year. The House report, to which the

conference agreement followed as to section 6651(f), explains that

> The bill modifies present law by providing that the fraud and negligence penalties are not to apply in the case of a negligent or fraudulent failure to file a return. Instead, the bill provides that in the case of a fraudulent failure to file a return, the failure to file penalty is to be increased to 15 percent of the net amount of tax due for each month that the return is not filed, up to a maximum of 5 months or 75 percent. The burden of proof on the fraud element of this increased portion of the penalty is on the IRS (sec. 7454(a)). If the IRS does not sustain its burden, and if the IRS determined in the alternative in the notice of deficiency that the taxpayer is liable for the basic failure to file penalty under section 6651(a)(1), then the Court could consider the basic penalty and the burden of proof in respect thereof would be on the taxpayer. On the other hand, if the IRS does not sustain its burden on the fraud element and failed to make an alternative determination on the notice but did in its answer or other pleading assert that the taxpayer is liable for the basic penalty, then the Court could also consider that penalty but the burden of proof in respect thereof would be on the IRS. Finally, if the IRS does not sustain its burden on the fraud element and failed to either make an alternative determination in the notice or assert the basic penalty in its answer, the Court could not consider that penalty and the taxpayer would not be liable for any failure to file penalty.
>
> The committee has made this modification to improve the coordination of the failure to file penalty with the accuracy-related penalties. The committee intends that the courts and the IRS should consider the same elements when considering the imposition of this new aspect of the penalty as is done under present law when considering imposition of the 6653 penalty where there has been a failure to file a return. Thus, the actions or behavior that trigger the penalty under the bill are to be the same as those under present law.
>
> [H. Rept. 101–247, at 1402–1403 (1989).]

Thus, the fraud (section 6663) and negligence (section 6662(b)(1)) penalties are not to apply in cases where the Commissioner determines a penalty for negligent or fraudulent failure to file a return. According to the committee report this modification of the traditional fraud-negligence scenario was done to improve the coordination of the failure to file penalty with the accuracy-related penalties of sections 6662–6664.

We note that section 6653 "under present law" related to additions to tax for negligence and fraud. (Section 6653 was amended in 1989 by OBRA, Pub. L. 101–239, sec. 7721(c)(1), 103 Stat. 2399, for returns due after December 31, 1989 without regard to extensions, and now relates to "Failure to

pay stamp tax.") We therefore proceed on the premise that in applying section 6651(f) to determine whether petitioners' failure to file their 1990 return was fraudulent, we must consider the same elements as is done when considering the imposition of the addition to tax for fraud under former section 6653(b)(1) and present section 6663.

We need not reiterate our previous discussion of the fraud issue in this case. The same badges of fraud that existed in 1989 persisted throughout 1990. Furthermore, petitioners' failure to timely file their 1990 return itself appears to have been a flagrant effort at concealment on their part, since the Form 4868 that they filed reported zero estimated tax liability, a knowing misrepresentation of the true facts. We accordingly hold that petitioners' failure to timely file the 1990 return was fraudulent pursuant to section 6651(f). However, since respondent made substitute returns for petitioner on May 2, 1991, which was within 30 days of the April 15, 1991 due date, the addition to tax is limited by reason of sections 6651(f)(1) and 6651(a)(1) to 15 percent of petitioner's tax liability, a fact which the deficiency notice addressed to petitioner concedes.

As to Mrs. Clayton, respondent asserted in the alternative the section 6651(a)(1) addition for failure to file a timely return for 1990. We have previously decided this issue adversely to Mrs. Clayton in that we have held that petitioners' application for extensions of time were invalid. This addition to tax is 5 percent of Mrs. Clayton's income tax liability since her substituted return was made within 30 days of the April 15, 1991, due date.

Respondent also determined additions to tax for 1990 under section 6654 for underpayment of estimated Federal income tax. This addition to tax is mandatory absent a showing by petitioners that one of the several statutorily provided exceptions applies. *Grosshandler v. Commissioner,* 75 T.C. 1, 20–21 (1980). Petitioners made no such showing. Respondent's determination is therefore sustained.

Except as noted above we need not consider respondent's alternative positions for the reasons stated.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*