# United States Tax Court

T.C. Memo. 2023-88

GREG A. NINKE AND JANE M. NINKE,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 10110-20.                         Filed July 19, 2023.

————

Ps failed to keep appropriate business records, and R employed a bank deposits analysis to determine Ps' unreported business income. R accepted that some cash deposits were from excludable sources because it was clear that deposited cash was transferred from, or had been withdrawn from, another of Ps' accounts. Ps argue that, because PH did not receive cash payments in his business and Ps' cash withdrawals exceeded their cash deposits, all cash deposits should be assumed to be from an excludable source. Ps had at least eight accounts for which they provided no statements to R during his examination of their returns. Ps have not traced any contested cash deposit to an excludable source.

*Held*: Ps failed to prove error in R's bank deposits analysis.

*Held, further*, accuracy-related penalties sustained.

————

Greg A. Ninke and Jane M. Ninke, pro sese.

*Zachary B. Friedman*, *Rachael J. Zepeda*, and *Ashleigh R. Wise Friedman*, for respondent.

[*2]     MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, *Judge*:  By notice of deficiency dated February 5, 2020, respondent determined deficiencies in, and accuracy-related penalties with respect to, petitioners' federal income tax as follows:

| Year | Deficiency | Penalty § 6662(a)[1] |
|---|---|---|
| 2015 | $26,260 | $5,252 |
| 2016 | 11,500 | 2,300 |
| 2017 | 14,060 | 2,812 |

The parties have filed a Stipulation of Settled Issues.  The issues for decision are: (1) whether, and the extent to which, for each of the years at issue, petitioners underreported their gross receipts from business and (2) whether, for each of those years, they are liable for an accuracy-related penalty.  Other unsettled issues are computational, and we need not address them here.

FINDINGS OF FACT

*Preliminary Statement*

Before making our findings of fact, we pause to address petitioners' failure to comply with Rule 151, which addresses briefs.  We conducted a trial in this case, and, at its conclusion, we ordered the parties to file briefs, setting a schedule for seriatim briefs.  Rule 151(e)(3) requires that an opening brief contain proposed findings of fact in the form of numbered concise statements of essential fact, each statement supported by reference to the pages of the transcript or the exhibits or other sources relied on in support of the proposed finding.  The Rule directs that proposed findings precede both the points on which the party relies and the party's argument.  Petitioners' Seriatim Opening Brief does contain proposed findings of fact in numbered statements.  It violates the Rule, however, in that it does not

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect for the years in question, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect for those years, and Rule references are to the Tax Court Rules of Practice and Procedure.  All dollar amounts have been rounded to the nearest dollar.

**[\*3]** support those statements with references to transcript pages or Exhibits.

Rule 151(e)(3) also requires that, in an answering or reply brief, a party "set forth any objections, together with the reasons therefor, to any proposed findings of any other party." Respondent filed his Seriatim Answering Brief, making 108 proposed findings of fact, and petitioners asked for, and were granted, leave to file their Seriatim Reply Brief. However, they filed no reply brief. Because petitioners have failed both to provide us with useable findings of fact and to object to respondent's proposed findings, we must conclude that they have conceded respondent's proposed findings of fact as correct except to the extent unsupported by, or inconsistent with, evidence in the record. *See, e.g.*, *Jonson v. Commissioner*, 118 T.C. 106, 108 n.4 (2002), *aff'd*, 353 F.3d 1181 (10th Cir. 2003).

*Stipulation*

The parties have stipulated certain facts and the authenticity of certain documents. The facts stipulated are so found, and the documents stipulated are accepted as authentic.

*Residence*

When petitioners filed the Petition, they resided in Tempe, Arizona.

*Petitioners' Businesses*

During all years at issue, Mr. Ninke operated Tanner Media Productions, which provided pornographic websites and other forms of adult entertainment. During 2015, he operated an electronic book publishing business under the name Tanner Media Publishing. During 2016 and 2017, he had an Uber and Lyft driving business. During 2017, Mrs. Ninke worked as a model for one of her husband's websites.

*Petitioners' Bank Accounts and Prepaid Debit Card Accounts*

During the years at issue, petitioners had between 12 and 20 accounts at various banks, including Bank of America, E\*Trade, Paxum, Salliemae, SunTrust Bank, US Bank, and TCF National Bank. Petitioners also maintained prepaid debit card accounts at financial service providers, including Paxum, FirstChoicePay/Payoneer, and NetSpend. Mr. Ninke received at least some payments for his

[*4] businesses by way of direct bank deposits and additions to one of his prepaid debit cards.

*Petitioners' Returns*

For the years at issue, petitioners made joint income tax returns on Forms 1040, U.S. Individual Income Tax Return. For each of those years, they included with Form 1040 one or more Schedules C, Profit or Loss From Business. For each year, they included a Schedule C for Tanner Media Productions (Schedule C–1). For 2015, they included a Schedule C for Tanner Media Publishing (Schedule C–2). During 2017, Ms. Ninke received gross receipts from her modeling business, but petitioners did not report any income from that business on their 2017 return. The parties refer to respondent's adjustment for unreported gross receipts for Ms. Ninke's modeling business as the "Schedule C–3" adjustment (and so shall we).

*2015 Return, Schedules C–1 and C–2[2]*

On the 2015 Schedule C–1, petitioners reported gross receipts of $191,121, expenses of $175,261, a separately listed expense of $1,939 for business use of their home, and a net profit of $13,921. On the 2015 Schedule C–2, they reported gross receipts of $543, expenses of zero, and a net profit of $543.

*2016 Return, Schedule C–1*

On the 2016 Schedule C–1, petitioners reported gross receipts of $66,847, expenses of $66,240, and a net profit of $607.

*2017 Return, Schedule C–1*

On the 2017 Schedule C–1, petitioners reported gross receipts of $20,728, expenses of $16,582, and a net profit of $4,146.

---

[2] Petitioners filed their 2015 return on April 15, 2016. On or around June 7, 2016, petitioners amended their joint 2015 return, attaching an updated 2015 Schedule C–1. The updated 2015 Schedule C–1 reported increased gross receipts and expenses and a greater net profit. On or about October 12, 2017, petitioners amended their 2015 return a second time, attaching a further updated 2015 Schedule C–1, reverting to the information reported on the original 2015 Schedule C–1. Respondent appears not to have relied on the first amended return. We report the information on the identical first and third 2015 Schedules C–1.

**[\*5]** *Respondent's Examination*

Respondent examined petitioners' returns for the years at issue. Revenue Agent (RA) Ian Smith conducted the examination. Petitioners did not maintain proper records for their Schedule C businesses. To determine whether petitioners had reported all receipts from those businesses, RA Smith conducted a bank deposits analysis, comparing reported Schedule C receipts to bank deposits. He treated the prepaid debit card accounts as if they were checking accounts. He reviewed the account statements that petitioners provided to him. He created spreadsheets, wherein he listed all deposits made in the respective accounts, identified the source of each deposit, and categorized each (i.e., transfer, deposit, loan, refund, adjustment, etc.). He then created a summary sheet for each year, on which he entered the year's deposits, subtracted deposits from identifiable nontaxable sources, e.g., bank-to-bank transfers, counter credits, and items such as Social Security disability payments, and compared the difference with the gross income petitioners reported for the year. For each year, the difference exceeded petitioners' reported gross income, and he treated the difference as unreported gross receipts from petitioners' Schedule C businesses.

*2015 Adjustments*

RA Smith determined 2015 Schedule C–1 unreported gross receipts of $20,132, which he computed as follows:

| | |
|---|---|
| Schedule C–1 bank deposits | $408,830 |
| Plus: FirstChoicePay deposits | 4,367 |
| Plus: NetSpend deposits | 4,685 |
| **Total Schedule C–1 deposits** | **$417,882** |
| Less: Excludable deposits | 203,329 |
| Less: Bills.Com and NetSpend adjustments | 3,300 |
| **Total taxable Schedule C–1 deposits per exam** | **$211,253** |
| Less: Schedule C–1 receipts per return | 191,121 |
| **Schedule C–1 adjustment** | **$20,132** |

[*6]  RA Smith determined 2015 Schedule C–2 unreported gross receipts of $2,052, which he computed as follows:

| | |
|---|---:|
| Schedule C–2 bank deposits | $2,595 |
| Less: Schedule C–2 receipts per return | 543 |
| **Schedule C–2 adjustment** | **$2,052** |

In total, RA Smith made 2015 Schedule C adjustments of $22,184, computed as follows:

| | |
|---|---:|
| Schedule C–1 adjustment | $20,132 |
| Schedule C–2 adjustment | 2,052 |
| **Schedule C adjustments** | **$22,184** |

The parties stipulate that an additional $3,190 of deposits is excludable 2015 Schedule C–1 deposits, which they further stipulate reduces RA Smith's 2015 Schedule C–1 adjustment to $16,942. They stipulate the following 2015 Schedule C gross receipts in dispute:

| | |
|---|---:|
| Schedule C–1 adjustment | $16,942 |
| Schedule C–2 adjustment | 2,052 |
| **Total** | **$18,994** |

On brief, respondent does not mention the stipulated $3,190 of additional Schedule C–1 excludable deposits. However, he concedes "additional" 2015 Schedule C–1 excludable deposits of $4,540. Respondent proposes that we find a 2015 Schedule C–1 adjustment of $15,592, which equals RA Smith's Schedule C–1 adjustment of $20,132 less $4,540 ($15,592 = $20,132 − $4,540). That would result in the following 2015 Schedule C gross receipts in dispute:

| | |
|---|---:|
| Schedule C–1 adjustment | $15,592 |
| Schedule C–2 adjustment | 2,052 |
| **Total** | **$17,644** |

Were we to subtract from RA Smith's Schedule C–1 adjustment of $20,132 both the stipulated $3,190 and the conceded $4,540 of additional excludable deposits, the resulting 2015 Schedule C–1 adjustment would be $12,402 ($12,402 = $20,132 − $3,190 − $4,540).

[*7] That would result in the following 2015 Schedule C gross receipts in dispute:

| | |
|---|---|
| Schedule C–1 adjustment | $12,402 |
| Schedule C–2 adjustment | 2,052 |
| **Total** | **$14,454** |

*2016 Adjustment*

RA Smith determined 2016 Schedule C–1 unreported gross receipts of $24,595, which he computed as follows:

| | |
|---|---|
| Schedule C–1 bank deposits | $185,730 |
| Plus: FirstChoicePay deposits | 16,370 |
| Plus: NetSpend deposits | 69 |
| **Total Schedule C–1 deposits** | **$202,169** |
| Less: Excludable deposits | 110,728 |
| **Total taxable Schedule C–1 deposits per exam** | **$91,442**[3] |
| Less: Schedule C–1 receipts per return | 66,847 |
| **Schedule C–1 adjustment** | **$24,595**[4] |

RA Smith did not determine any 2016 Schedule C–2 unreported deposits.

The parties stipulate that an additional $46 of deposits is excludable 2016 Schedule C–1 deposits, which they further stipulate reduces RA Smith's 2016 Schedule C–1 adjustment to $24,549.

On brief, as for 2015, respondent does not mention the stipulated additional $46 of excludable deposits but concedes "additional" 2016 excludable deposits of $46. Respondent proposes that we find a 2016 Schedule C–1 adjustment of $25,548 (apparently correcting the $1 math error in the stipulation).

Were we to subtract from RA Smith's Schedule C–1 adjustment of $24,594 both the stipulated and conceded adjustments of $46, the

---

[3] Sic: correctly, $91,441.

[4] Sic: correctly, $24,594.

[*8] resulting Schedule C–1 adjustment would be $24,502 ($24,502 = $24,594 − $46 − $46).

*2017 Adjustment*

RA Smith determined 2017 Schedule C–1 unreported gross receipts of $29,642, which he computed as follows:

| | |
|---|---|
| Schedule C–1 bank deposits | $109,080 |
| Plus: FirstChoicePay deposits | 9,507 |
| Plus: NetSpend deposits | 4,759 |
| **Total Schedule C–1 deposits** | **$123,346** |
| Less: Excludable deposits | 72,976 |
| **Total taxable Schedule C–1 deposits per exam** | **$50,370** |
| Less: Schedule C–1 receipts per return | 20,728 |
| **Schedule C–1 adjustment** | **$29,642** |

RA Smith did not determine any 2017 Schedule C–2 unreported deposits.

RA Smith determined 2017 Schedule C–3 unreported gross receipts of $3,784.

In total, RA Smith made 2017 Schedule C adjustments of $33,426.

| | |
|---|---|
| Schedule C–1 adjustment | $29,642 |
| Schedule C–3 adjustment | 3,784 |
| **Schedule C adjustments** | **$33,426** |

The parties stipulate that an additional $1,387 of deposits is excludable 2017 Schedule C–1 deposits, which they further stipulate reduces RA Smith's 2017 Schedule C–1 adjustment to $28,255. They stipulate the following 2017 Schedule C gross receipts in dispute:

| | |
|---|---|
| Schedule C–1 adjustment | $28,255 |
| Schedule C–3 adjustment | 3,784 |
| **Total** | **$32,039** |

On brief, as for 2015 and 2016, respondent does not mention the stipulated additional $1,387 of 2017 Schedule C–1 excludable deposits

**[*9]** but concedes "additional" 2017 Schedule C–1 excludable deposits of $1,518. Respondent proposes that we find a 2017 Schedule C–1 adjustment of $28,124, which equals RA Smith's Schedule C–1 adjustment of $29,642 less $1,518 ($28,124 = $29,642 − $1,518). That would result in the following 2017 Schedule C gross receipts in dispute:

| | |
|---|---|
| Schedule C–1 adjustment | $28,124 |
| Schedule C–3 adjustment | 3,784 |
| **Total** | **$31,908** |

Were we to subtract from RA Smith's Schedule C–1 adjustment of $29,642 both the stipulated $1,387 and the conceded $1,518 of additional excludable deposits, the resulting 2017 Schedule C–1 adjustment would be $26,737 ($26,737 = $29,642 − $1,387 − $1,518). That would result in the following 2017 Schedule C gross receipts in dispute:

| | |
|---|---|
| Schedule C–1 adjustment | $26,737 |
| Schedule C–3 adjustment | 3,784 |
| **Total** | **$30,521** |

*Penalties*

RA Smith properly obtained written supervisory approval of an accuracy-related penalty for each year at issue.

*Trial Exhibits*

At trial, we received into evidence from petitioners lists of deposits that they believe respondent should have accepted as excludable deposits. Many of the deposits on petitioners' lists were among those respondent allowed while others petitioners sourced to bank accounts and prepaid debit card account statements that they had not identified to RA Smith. Petitioners conceded at trial at least eight bank accounts or prepaid debit card accounts for which they had provided no information to RA Smith.

**[\*10]**                        OPINION

I.      *Introduction*

To reiterate, the issues we must decide are (1) respondent's adjustments increasing petitioners' gross receipts from their Schedule C business activities and (2) the accuracy-related penalties.

II.     *Burden of Proof*

Petitioners bear the burden of proof.   *See* Rule 142(a).[5] Nevertheless, because this case involves unreported income, respondent must make a minimal evidentiary showing connecting petitioners with an alleged income-producing activity or demonstrate that they actually received unreported income. *See Walquist v. Commissioner*, 152 T.C. 61, 67 (2019).  The requisite evidentiary foundation to connect a taxpayer with an income-producing activity is minimal and need not include direct evidence.  *See, e.g.*, *Banister v. Commissioner*, T.C. Memo. 2008-201, 2008 WL 3925877, at \*2, *aff'd*, 418 F. App'x 637 (9th Cir. 2011).

Petitioners' Schedule C businesses provided a likely income-producing source for the disagreed cash deposits, and, in any event, for purposes of sustaining an adjustment in a notice of deficiency increasing gross income, a bank deposit is prima facie evidence of income. *Tokarski v. Commissioner*, 87 T.C. 74, 77 (1986).  Respondent has carried his burden of connecting petitioners with an income-producing activity.

Respondent also bears the burden of production with respect to the penalties, which we discuss *infra*.

III.    *Unreported Income*

A.      *Bank Deposits Analysis*

Gross income includes "income derived from business."  § 61(a)(2). Taxpayers must maintain books and records sufficient to establish their income and expenses.  § 6001; Treas. Reg. § 1.6001-1(a).  If they fail to

---

[5] Petitioners have not raised the applicability of section 7491(a), which shifts the burden of proof to the Commissioner in certain situations.  We conclude that section 7491(a) does not apply here because petitioners have not produced evidence that they have satisfied the preconditions for its application.  Indeed, we have found that petitioners failed to maintain proper records for their Schedule C businesses. Proper record keeping is a condition to the application of section 7491(a).  *See* § 7491(a)(2)(B).

**[\*11]** do so, the Commissioner may reconstruct income through any reasonable method that clearly reflects income. § 446(b); *Petzoldt v. Commissioner*, 92 T.C. 661, 693 (1989). This Court has long accepted the bank deposits method for this purpose. *Clayton v. Commissioner*, 102 T.C. 632, 645 (1994). The bank deposits method assumes all money deposited in a taxpayer's bank account during a given period constitutes either an item of gross income or a gross receipt. *See DiLeo v. Commissioner*, 96 T.C. 858, 868 (1991). If, however, the Commissioner has knowledge that a deposit is from an excludable source (e.g., is a gift) he must exclude it from his tally of taxable deposits. *See id.*

Because respondent believed that petitioners had not reported all income from their Schedule C businesses for the years at issue, and because they had not maintained proper business records, respondent's agent, RA Smith, conducted a bank deposits analysis, which resulted in his determination that petitioners had underreported their Schedule C income for each of the years at issue. Neither at trial nor on brief do petitioners challenge the accuracy of the account statements on which RA Smith relied.

  B.  *Parties' Arguments*

    1.  *Petitioners' Argument*

Petitioners identify as the only fault with respondent's bank deposits analysis his failure to treat as nontaxable transfers between bank accounts *all* cash deposits that they made during the years at issue. They spend approximately half of their brief listing individual cash deposits and withdrawals from their bank accounts and prepaid debit card accounts during the years at issue. They show deposits totaling $28,550 and withdrawals totaling $44,639. They ask us to find that Mr. Ninke's clients did not pay him in cash. That presumed fact, together with the excess of withdrawals over deposits, they argue, "strongly suggests that the deposits made by the petitioners was [sic] a transfer, made out of cash previously withdrawn by petitioners. There is no reasonable explanation for the cash deposits other than that the funds were being transferred." They concede that "respondent accepted that certain cash deposits were actually transfers, but only when . . . the cash deposit was close in time and/or in [an] amount [equal] to the prior withdrawal." They argue: "[R]espondent should not be allowed to arbitrarily decide whether the petitioner[s] deposited their cash withdrawal fast enough or in an amount close enough to the withdrawal."

[*12]        2.        *Respondent's Arguments*

Respondent rejects petitioners' proposed finding that Mr. Ninke's clients did not pay him in cash as "uncorroborated, self-serving, and not supported by credible evidence."  Respondent also rejects petitioners' claim that RA Smith acted arbitrarily in treating only some cash deposits as excludable deposits.  He points out that, despite petitioners' lack of records, RA Smith treated as deposits from excludable sources deposits that he could associate with a withdrawal shown on a bank account statement provided to him by petitioners. Respondent adds that, in support of their claim that *all* cash deposits to their bank accounts were no more than nontaxable transfers from other of their accounts, they rely in part on claimed withdrawals from bank accounts and prepaid debit accounts for which they provided no statements to RA Smith (and which did not figure into his tally of bank deposits).  With postexamination adjustments to be discussed, respondent claims that RA Smith did not err in his bank deposits analysis.

C.        *Discussion*

Petitioners' burden is to identify additional cash deposits from excludable sources beyond the deposits accepted as such by RA Smith. Their claim is that all cash deposits during the years at issue were transfers from one or another of their bank accounts.  It is well settled that we need not accept a taxpayer's self-serving testimony when the taxpayer fails to present credible, corroborative documentary evidence. *See, e.g.*, *Shilgevorkyan v. Commissioner*, T.C. Memo. 2023-12, at *7.  At more than one point during the trial, we explained to petitioners that their task on brief would be to tie deposits that respondent had not treated as coming from an excludable source to a transfer or a withdrawal from an account previously identified to respondent.  They have made no attempt to do so.  Showing that cash withdrawals exceeded cash deposits for the years at issue does not prove that any deposit was of cash withdrawn from the same account or any other account of petitioners.  And even were we to accept petitioners' claim that Mr. Ninke's clients did not pay him in cash, their introduction at trial of evidence of withdrawals from bank accounts and prepaid debit card accounts that they had not disclosed to RA Smith raises the possibility of unreported income (whether paid in cash or otherwise) deposited to undisclosed accounts, withdrawn as cash, and redeposited

**[\*13]** in accounts of which RA Smith did know. Such deposits would not ultimately be from an excludable source.

Petitioners have failed to carry their burden of showing cash deposits from excludable sources more than the cash deposits accepted as such by respondent.

Finally, we have the issue of the parties' stipulating additional Schedule C–1 excludable deposits of $3,190, $46, and $1,387 for 2015, 2016, and 2017, respectively, while, on brief, respondent—not mentioning those stipulations—concedes "additional" Schedule C–1 deposits of $4,540, $46, and $1,518 for those years. We resolve that discrepancy in petitioners' favor and assume that respondent means for each year that the sum of the two amounts be considered additional Schedule C–1 deposits from excludable sources.

We sustain positive adjustments to Schedule C gross receipts of $14,454, $24,502, and $30,521 for 2015, 2016, and 2017, respectively.

IV.    *Accuracy-Related Penalty*

A.    *Introduction*

Section 6662(a) and (b)(1) provides for an accuracy-related penalty of 20% of the portion of an underpayment of tax required to be shown on a return attributable to negligence or disregard of rules and regulations (without distinction, negligence). Section 6662(a) and (b)(2) provides for the same penalty on the portion of an underpayment of tax attributable to any substantial understatement of income tax. In the case of an individual, there is a substantial understatement of income tax for a year if the amount of the understatement exceeds the greater of (1) 10% of the tax required to be shown on the return for the tax year or (2) $5,000. § 6662(d)(1)(A). Section 6664(c)(1) provides a reasonable cause exception to imposition of the section 6662(a) accuracy-related penalty on that portion of an underpayment for which it is shown that there was reasonable cause and the taxpayer acted in good faith.

Only one accuracy-related penalty may be applied with respect to any given portion of an underpayment even if that portion is subject to the penalty on more than one of the grounds set out in section 6662(b). Treas. Reg. § 1.6662-2(c).

**[\*14]** B. *Burden of Production*

 1. *Introduction*

  The Commissioner bears a burden of production with respect to the accuracy-related penalty, including making a prima facie case that the section 6751(b)(1) requirement for written supervisory approval has been met. *E.g., DeCrescenzo v. Commissioner*, T.C. Memo. 2023-7, at \*18. Section 6751(b)(1) provides: "No penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate."

 2. *Penalty Approval*

  The parties stipulate, and we have found, that RA Smith properly obtained written supervisory approval of an accuracy-related penalty for each year at issue. Respondent has made a prima facie case with respect to the penalty approval required by section 6751(b)(1).

 3. *Grounds for the Penalty*

  Respondent has also made a prima facie case for the accuracy-related penalties on the grounds that, for each year at issue, petitioners' underpayment of tax resulted from negligence. Petitioners did not maintain proper records for their Schedule C businesses. Negligence includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly. *See Diesel Country Truck Stop, Inc. v. Commissioner*, T.C. Memo. 2000-317, 2000 WL 1478654, at \*17; Treas. Reg. § 1.6662-3(b)(1).

  Respondent claims as an alternative basis for the accuracy-related penalty that petitioners substantially understated their income tax for the years at issue. We need not reach that question.

C. *Burden of Proof*

  Respondent having met his burden of production with respect to the penalty, the burden of proof (viz, the risk of nonpersuasion) is with petitioners and includes the burden to prove any affirmative defense. *See, e.g., Fabian v. Commissioner*, T.C. Memo. 2022-94, at \*38. Petitioners argue that they acted reasonably in reporting any income reported to them on information returns and did not believe that they

**[\*15]** had any additional cash receipts that were income. Petitioners ignore that RA Smith found unreported income for each year at issue well in excess of cash deposits that petitioners claim were redeposits of transfers or withdrawals from their various bank accounts and prepaid debit card accounts. Petitioners have failed to prove that there was reasonable cause for their underpayments and that they acted in good faith.

We sustain the accuracy-related penalties for the years at issue.

V.    *Conclusion*

To reflect the foregoing,

*Decision will be entered under Rule 155.*