T.C. Memo. 2011-68

UNITED STATES TAX COURT

ELIZABETH J. PRATER, Petitioner v. COMMISSIONER OF INTERNAL
REVENUE, Respondent

CHARLES B. PRATER, Petitioner v. COMMISSIONER OF INTERNAL
REVENUE, Respondent

Docket Nos. 9314-06, 9317-06.     Filed March 24, 2011.

David De Coursey Aughtry and George B. Abney, for
petitioners.

Brianna B. Taylor, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, Judge:   Respondent determined deficiencies in
petitioners' Federal income tax and penalties as follows:

|  | | Penalties |
| Year | Deficiency | Sec. 6663(a) |
| 1991 | $24,905 | $18,678.75 |
| 1992 | 83,746 | 62,809.50 |
| 1993 | 437,444 | 328,083.00 |

After concessions[1] the issues for decision are:

(1) Whether petitioners failed to report income of $78,000, $262,281, and $1,178,428 for 1991, 1992, and 1993, respectively, related to a trucking business of which Mr. Prater was part owner; and

(2) whether Mr. Prater is liable for section 6663[2] civil fraud penalties of $18,678.75, $62,809.50, and $328,083 for years 1991, 1992, and 1993, respectively.

Some of the facts have been stipulated and are so found.

The record in this case also includes a lengthy trial record and voluminous exhibits. Many of these exhibits had previously been admitted in a criminal prosecution of Mr. Prater and other defendants, but much of the evidence was first admitted in the present case. Both this case and the prior criminal case against Mr. Prater center on his activities as coowner and manager of

---

[1]Respondent concedes that Mrs. Prater is not liable for the sec. 6663(a), I.R.C., fraud penalty. Mrs. Prater concedes her sec. 6015, I.R.C., innocent spouse claim.

[2]Section references are to the Internal Revenue Code in effect for the years at issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

Carpet Transport, Inc. (CTI). There is no doubt that Mr. Prater caused receipts from CTI's business to be omitted from CTI's books and records and also from CTI's income tax returns. What Mr. Prater caused to happen to the cash is factually complex, and the extent to which he is deemed the recipient of the income is determined herein. On the record before us, we also determine that Mr. Prater is subject to the 75-percent fraud penalty.

## FINDINGS OF FACT

At the time of filing their petitions, petitioners resided in Georgia. Mr. Prater served as a member of the city council in Plainville, Georgia, for 8 years. He also served as mayor of Plainville, Georgia, for 8 years. Mr. Prater operated a number of businesses before CTI, including a dump truck business and a used car business. He is an intelligent and hard-working businessman.

1. <u>Carpet Transport, Inc.</u>

In 1978 Mr. Prater acquired a one-third ownership interest in CTI. The company had approximately 600 trucks and 1,000 employees by the early 1990s. CTI was headquartered in Calhoun, Georgia. CTI operated as a common carrier providing motor freight transportation through the 48 States of the continental United States. CTI's primary cargo was carpet.

Mr. Prater acquired a one-third interest in CTI in January 1978, with Lynwood S. Warmack (Mr. Warmack) and Gary Owens (Mr. Owens). In the early 1990s Mr. Owens passed away, and Mr. Prater and Mr. Warmack purchased Mr. Owens' interest and became the sole owners of CTI.

(a) CTI: Backhaul

After CTI completed a delivery from its headquarters to another destination, CTI would try to arrange a "backhaul" trip. A backhaul is the delivery of cargo from as close to the first delivery as possible to as close to CTI's headquarters in Calhoun, Georgia, as possible. The goal of a backhaul is to avoid having a truck travel long distances without any cargo. Mr. Prater arranged all backhaul trips for CTI. The checks received for backhauls were given to Mr. Prater by the drivers when they returned from their trips. The checks would be paper clipped to the outside of the trip envelopes, and Mr. Prater would then pay the drivers 25 percent of the backhaul amounts. Mr. Prater would place the freight bills that were attached to the backhaul checks in garbage bags. He would then endorse the checks and take control over them. Generally, Mr. Prater would give the checks to CTI employees to have the checks cashed and the cash distributed as he directed.

From 1991 to 1993 backhaul checks totaling $3,553,446 were not deposited into CTI's bank accounts.  Specifically, $544,822.82, $821,886.67, and $2,186,735.86 in backhaul checks were not deposited into CTI's bank accounts in 1991, 1992, and 1993, respectively.  A portion of the cash from the backhaul checks was used to pay the drivers, and large amounts were provided to W.J. Plemons Insurance, Inc. (PI), and held in a prepaid insurance account in CTI's name.

   (b)  CTI:  Department of Transportation Regulations

The Department of Transportation (DOT) regulated and limited the number of hours that truck drivers could drive.  The DOT required truck drivers to keep logs, which were then inspected by DOT.  The logs would provide the driver's departure time, when the driver stopped, and for how long.  A driver would be "off-log" if he drove miles or hours not recorded as required.  The DOT would then compare the drivers' logs for consistency against other documents, such as toll or gas receipts, which often had a timestamp.  The DOT shut down CTI at least once for having too many drivers driving "off-log".  The DOT also fined CTI several times with penalties as high as $70,000.

(c)  CTI:  Off-Log Hours and Expenses

Legally, truck drivers could work only 60 hours per week. Mr. Prater would pay the drivers in cash for work beyond 60 hours per week.  Mr. Prater did not require the workers to sign any documentation when he gave them cash payments, and he did not appear to keep any record of the cash payments made.  CTI kept two sets of timecards and separately recorded work done by a driver when he worked over 60 hours a week.

A driver submitted a trip envelope at the end of each trip listing expenses for the trip on the outside of the envelope and placing the receipts from the trip inside the envelope.  If a driver had either fuel or toll tickets that did not match the DOT logs, Mr. Prater would give the driver cash for those receipts in lieu of having the driver submit the expense in the trip envelope.  Mr. Prater claims that he paid these expenses in cash to conceal from the DOT the off-log driving.  Mr. Prater would then take the receipts for which he had paid cash and place them into a garbage bag which was taken to storage.  Sometimes the dates on the receipts were changed to avoid discovery of the violation of the DOT regulations.  The receipts retrieved from the garbage bags in storage totaled $22,060.63, $661,382.85, and $252,294.60 for tax years 1991, 1992, and 1993, respectively.

(d) <u>CTI: Cashing of Advance and Payroll Checks for Drivers by Mr. Prater</u>

CTI provided drivers pretyped advance checks of $50 before they departed on deliveries. This allowed the drivers to get started right away without having to stop somewhere to cash their advance checks. The checks were drawn on a CTI special account and were pretyped so the dispatchers could not write the checks for different amounts. The dispatchers cashed these checks for the drivers. Mr. Prater also cashed advance checks for the drivers and sometimes cashed the drivers' paychecks for them.

Many of the first endorsements on the CTI special and payroll checks were not made by the payees. Many of the checks were cashed by the drivers' wives or roommates while drivers were out of town driving for CTI because the drivers were not available to sign the checks.

(e) <u>CTI: Other Cash Payments</u>

Mr. Prater would sometimes reimburse drivers for expenses after trips with cash. Mr. Prater would also pay cash bonuses to drivers for "hot loads", which were shipments that needed to be shipped as soon as possible. No record of such cash bonuses was maintained. Further, CTI employees, such as dispatchers, were paid in cash on occasion. For example, Mr. Wright, a full-time dispatcher, was originally paid $300 weekly by check and $100 in

cash. Mr. Prater told Mr. Wright not to worry about being paid in cash "because everyone cheats the IRS".

Mr. Prater testified that he paid the drivers in cash as an incentive to keep them with CTI; he further explained that the drivers wanted to be paid in cash. Often the drivers drove more hours than the DOT allowed, and cash payments concealed these violations.

(f) <u>CTI: Other Cash Income or Cash To Pay Expenses</u>

Mr. Prater would arrange trips for CTI clients who paid for exclusive-use loads, whereby the client would have use of a whole trailer. The clients would pay for this service in cash, which was given to Mr. Prater.

As a result of these cash dealings, there were occasions when a substantial amount of cash was lying around Mr. Prater's office.

(g) <u>Side Business</u>

CTI had a side business of selling carpet. If a cargo of carpet was damaged in shipment, the carpet retailer might not accept it. As a result, CTI would often have to absorb the cost of the damaged carpet and sold the excess carpet to wholesalers or smaller companies.

2.    W.J. Plemons Insurance

William J. Plemons owned PI, an insurance agency working primarily with freight carriers.  PI customers would pay PI, and PI in turn would pay the insurance carriers after deducting commissions.  PI wrote insurance policies for CTI and personal insurance policies for Mr. Prater.  PI provided various insurance policies for CTI, including automobile and truck liability insurance, cargo insurance, workers compensation insurance, and terminal coverage insurance.  PI would set up multiple accounts for larger clients, like CTI.  CTI paid fees for liability and cargo insurance based upon gross miles driven or gross receipts.  The premiums paid were based on estimates.  Since CTI operated hundreds of trucks, a number of claims could arise; and consequently PI arranged to hold funds for CTI to pay the deductibles as accidents or as insured incidents arose.  This reserve account was also used to hold large amounts of off-book receipts of CTI.  On occasion Mr. Prater and CTI borrowed money against the CTI reserve accounts on deposit with PI.  To borrow money, Mr. Prater would contact Mr. Plemons, who would then require Mr. Prater to sign a note.  If the note was paid off, PI employees would document in PI's books and records that it had been paid.

### 3. PI: Third-Party Checks and Backhaul Deposits

In addition to insurance for CTI, PI also handled personal insurance for Mr. Prater and Chris Frix, Mr. Prater's stepson. Mr. Frix worked for PFW, a real estate company created in late 1991 that rented apartments, built houses, and developed land. PFW was owned one-third each by Mr. Prater, Mr. Frix, and Bill Walraven. Mr. Prater and Mr. Frix had client account numbers at PI distinct from the corporate accounts for CTI.

Mr. Frix and Mr. Walraven managed PFW's day-to-day operations. PFW rented housing to CTI employees. If a CTI employee owed PFW rent, CTI would write an advance check payable to the employee. Mr. Frix would then pick up the check from CTI as payment to PFW for the employee's rent. Typically while a driver was on the road, CTI would issue a check in the driver's name and give the check to Mr. Frix.

### 4. Other Companies

Mr. Prater coowned A&P Transportation (A&P) and Chase Truck Brokers (CTB), a truck brokerage company that brokered freight. In addition, he cofounded CPCF, Inc., to purchase a Gold's Gym.

### 5. Mr. Prater's Criminal Conviction

Mr. Prater was a defendant in a criminal tax case in the U.S. District Court for the Northern District of Georgia beginning in 1995 and ending in 1998. On October 16, 1995, a

grand jury indicted Mr. Prater on multiple felony counts. Some of Mr. Prater's associates were also indicted by the grand jury. The charges were based upon the assertion that more than $3.5 million of backhaul and other checks payable to CTI was diverted and not reflected on CTI's records. A portion of the $3.5 million was cashed and another portion was funneled through PI, CTI's insurance company.

On March 11 1998, the indictment was redacted. Counts 13, 15, and 17 of the redacted indictment all related to charges of violation of section 7201, the evasion of personal income tax for 1991 through 1993, the same years as are here in issue. On March 16, 1998, a jury found Mr. Prater guilty on counts 1 through 19 and count 21 of the redacted indictment, which included the 3 tax evasion counts. The jury found Mr. Prater not guilty on counts 23 through 26 of the redacted indictment, which related to charges of obstruction of justice.

Mr. Prater's defense against the individual tax offenses was that there was no underpayment of income tax because, although the backhaul checks were unreported income, the money derived from these checks was used to fund corporate expenses.

On May 18, 1998, the District Court overturned the jury's convictions on counts 1 through 7, which were embezzlement charges. On July 1, 1998, the court entered its judgment

pursuant to the verdict. Mr. Prater appealed the remaining convictions to the Court of Appeals for the Eleventh Circuit. On June 6, 2001, the Court of Appeals in an unpublished opinion overturned the jury's verdicts on counts 8 through 11. Mr. Prater filed a motion for a hearing en banc before the Court of Appeals; this motion was denied on January 16, 2002.

On April 16, 2002, Mr. Prater filed a petition for a writ of certiorari with the U.S. Supreme Court, which was denied. On August 22, 2002, the District Court amended its judgment pursuant to the Court of Appeals' findings. After all appeals were exhausted, Mr. Prater's conviction for evasion of his individual income tax for each of the years 1991 through 1993 remained.

6. The Present Case

Lance Lobar (Mr. Lobar), CTI's primary outside accountant, prepared Mr. and Mrs. Prater's personal income tax returns. Mr. Lobar worked primarily with Mr. Warmack in gathering the necessary information for their returns. In early 1993 Mr. Lobar was diagnosed with multiple sclerosis, which resulted in his inability to continue working as an accountant. In addition, Mr. Warmack became semiretired as of 1992. Mr. Prater asked his accountants to include an additional $100,000 of income on his 1993 personal income tax return. Respondent accounted for the $100,000 in calculating petitioners' deficiency for 1993.

The notices of deficiency determined that petitioners failed to report income of $78,000, $262,281, and $1,178,428 for the years at issue.  Respondent classified this unreported income into three broad categories:  (1) Checks written from PI (Schedule 1 adjustments); (2) other transactions (Schedule 2 adjustments); and (3) deposits of CTI payroll and other checks (Schedule 3 adjustments).  The amounts by reference to Schedules 1, 2, and 3 in the notices are as follows:

| Other Income | 1991 | 1992 | 1993 |
|---|---|---|---|
| Checks written from PI (Sch. 1) | -0- | $79,750.00 | $551,918.40 |
| Other transactions (Sch. 2) | -0- | 3,000.00 | 332,000.00 |
| Deposits of CTI payroll and other checks (Sch. 3) | $78,000 | 179,530.68 | 294,509.53 |

| Schedule 1 | 1991 | 1992 | 1993 |
|---|---|---|---|
| Check #21767 dtd 3/26/92 payable to Chris Frix | | $9,750 | |
| Check #24141 dtd 12/28/92 for loan to Billie Bearden | | 70,000 | |
| Check #25003 dtd 3/19/93 for loan to Billie Bearden | | | $50,000.00 |
| Check #25300 dtd 4/16/93 for loan to PFW Properties | | | 60,000.00 |
| Check #25412 dtd 4/29/93 for purchase of building in Dalton from RBG Properties, Inc. | | | 360,979.82 |

| | | | |
|---|---|---|---|
| Check #26119 dtd 12/21/93 to Charles Prater used to purchase Gold's Gym | | | $300,000.00 |
| Less A&P Check #6224 included in Notes Rec. Stockholder Acct. | | | -109,996.59 |
| Less A&P Check #6412 included in Notes Rec. Stockholder Acct. | | | -109,094.83 |
| Total | -0- | $79,750 | 551,918.40 |

| Schedule 2 | 1991 | 1992 | 1993 |
|---|---|---|---|
| Wright CTI installment sale payment to PFW paid in capital, GB&T deposit on 7/2/93, Acct. #10132 | | | $6,000 |
| Blaize CTI installment sale payment to GB&T personal Acct. #303752 on 4/6/93 | | | 5,000 |
| Wable CTI installment sale payment to Calhoun FNB personal Acct. #0631612106 on 3/1/93 | | | 5,000 |
| Hudson CTI installment sale payment to PFW paid in capital, First Union deposit on 6/9/93, Acct. #56540029209 | | | 6,000 |
| Loan to Check-It-Out using checks payable to CTI | | | 300,000 |
| Frick's furniture payments | | $3,000 | 10,000 |
| Total | -0- | 3,000 | 332,000 |

| Schedule 3 | 1991 | 1992 | 1993 |
|---|---|---|---|
| Deposits of CTI payroll and other checks into PFW Properties Bank Acct. #10132 at GB&T | | | $4,286.35 |
| Deposits of CTI payroll and other checks into PFW Properties Bank Acct. #5540029209 at First Union | | $179,530.68 | 371.62 |
| Less deposit amounts not shown as paid in capital | | | -1,401.74 |
| Less deposit amounts not shown as paid in capital | | | -3,535.25 |
| Deposits of CTI income checks into PFW bank accounts | | | 294,788.55 |
| Deposits of CTI income checks into Prater's Acct. #302752 at GB&T | $78,000 | | |
| Total | 78,000 | 179,530.68 | 294,509.53 |

## OPINION

## I. The Parties' Basic Arguments

Mr. Prater designed and directed a scheme which caused receipts of over $3.5 million from CTI, the trucking business in which he was a part owner, to be left off the books of the company over the 3 years at issue. Mr. Prater controlled the cash generated by this scheme and diverted the funds for various purposes, many of which were related to CTI's business but some of which were personal to him. With the help of CTI's insurance agent, W.J. Plemons, he caused over $1.4 million to be held in a

prepaid insurance account for CTI, and he directed the use of the account for loans to individuals or entities he selected. He also used large amounts of the diverted CTI cash to provide unrecorded cash payments to CTI's drivers, ostensibly to conceal excess hours of driving from the DOT but actually also to hide such payments to the drivers from the IRS. This scheme resulted in a criminal case against Mr. Prater and several others with multiple counts including tax fraud; and ultimately, he was convicted of three counts of income tax evasion under section 7201 regarding the joint Federal income tax returns he filed with his spouse for 1991, 1992, and 1993. Respondent would now have us sustain the civil fraud penalty for all 3 years and also include roughly $1.5 million of the amounts diverted as Mr. Prater's taxable income subject to the 75-percent penalty. Respondent maintains that the amounts included in income are based upon specific items.

Petitioners' representatives counter that Mr. Prater received no additional income as a result of the diversions and that any amounts he did receive are offset by payments he made on behalf of CTI. Before we address the parties arguments, we will explain the procedural posture of this case.

II.  Procedural History

After the criminal case and the expiration of the 3-year and 6-year periods of limitation, respondent issued a separate notice of deficiency to each petitioner.  These notices of deficiency (collectively, the notices) were identical in the amounts determined.  The notices relied heavily upon information developed in the criminal case, more specifically upon a schedule used to track the money diverted from CTI's books which was introduced as an exhibit in the criminal case.  However, the explanation of the adjustments in the notices was cryptic at best.  It read:  "It is determined that you received additional income from W.J. Plemons Insurance Agency for services rendered and such income represents taxable income realized by you as shown in Exhibit A."

This statement was augmented by affirmative allegations in the answer which more fully described respondent's assertions regarding the money flowing through PI.  Nevertheless, the explanation in the notices is not accurate regarding the nature of the flow of funds which originated in the operations of CTI.  We find that respondent has the burden of proof regarding the affirmative allegations and the question of how much income Mr. Prater received.

Before trial respondent filed a motion for partial summary judgment based upon Mr. Prater's criminal conviction of income tax evasion for 1991 through 1993. Mr. Prater opposed that motion, arguing that he was denied access to witnesses during the criminal trial because the prosecution placed potentially favorable witnesses under threat of prosecution, preventing their testifying on his behalf. We ruled in January 2009 that arguments challenging the criminal conviction which could have been raised on appeal of the criminal case cannot be the basis for disputing the application of collateral estoppel in the civil case. See Wapnick v. Commissioner, T.C. Memo. 1997-133; Lilley v. Commissioner, T.C. Memo. 1989-602; Klein v. Commissioner, T.C. Memo. 1984-392, affd. 880 F.2d 260 (10th Cir. 1989). Accordingly, we placed the burden of proof on Mr. Prater to show by a preponderance of the evidence what portions of the underpayments of tax, if any were established, are not attributable to fraud. However, respondent retained the burden to show that there were underpayments of tax in accord with the affirmative allegations in the answer. On brief, Mr. Prater's representatives revisit the significance of the criminal conviction and argue that changes in the law of criminal procedure raise questions about the use of the conviction for collateral estoppel. We do not address these arguments because

we analyze the fraud issue hereinafter upon the evidence at trial without considering the criminal conviction.

III.  Civil Fraud

The penalty in cases of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud.  Helvering v. Mitchell, 303 U.S. 391, 401 (1938).  Under section 6663(a), that part of the underpayment of tax which is due to fraud is subject to a 75-percent addition to tax.

In applying the penalty under section 6663, we consider the same elements, or long-recognized "badges of fraud", discussed in cases applying section 6651(f) and former section 6653(b)(1). Clayton v. Commissioner, 102 T.C. 632, 647-653 (1994); see Niedringhaus v. Commissioner, 99 T.C. 202, 211-213 (1992).  Fraud may be proved by circumstantial evidence, and the taxpayer's entire course of conduct may establish the requisite fraudulent intent.  Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).

The existence of fraud is a question of fact to be resolved upon consideration of the entire record.  DiLeo v. Commissioner, 96 T.C. 858, 874 (1991), affd. 959 F.2d 16 (2d Cir. 1992).  Since direct evidence of fraud is rarely available, fraud may be proved by circumstantial evidence and reasonable inferences from the

facts.  Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989).
Courts have developed a nonexclusive list of factors or "badges
of fraud" that demonstrate fraudulent intent.  Niedringhaus v.
Commissioner, supra at 211.  These badges of fraud include:  (1)
Understatement of income; (2) inadequate records; (3) implausible
or inconsistent explanations of behavior; (4) concealment of
income or assets; (5) failure to cooperate with tax authorities;
(6) filing false documents; (7) failure to make estimated tax
payments; (8) dealing in cash; (9) engaging in illegal
activities; and (10) engaging in a pattern of behavior that
indicates an intent to mislead.  Vogt v. Commissioner, T.C. Memo.
2007-209, affd. 336 Fed. Appx. 758 (9th Cir. 2009).  No single
factor is necessarily sufficient to establish fraud; however, a
combination of several of these factors may constitute persuasive
evidence of fraud.  Niedringhaus v. Commissioner, supra at 211.

Mr. Prater intentionally caused funds to be unreported on
the books and records of CTI.  These actions were fraudulent and
meet the traditional elements of fraud such as concealment and
dealing in cash.  The issue presented is whether Mr. Prater's
fraud only affected CTI's income or whether it also resulted in
his fraudulently underreporting his personal income by concealing
funds he diverted from CTI for his own use.  The answer to this

question requires an analysis of the facts surrounding each of the adjustments in the notices issued to him.

## IV. Respondent's Specific Adjustments

### A. Schedule 1 Adjustments

Respondent determined that checks totaling $79,750 in 1992 and $551,918.40 in 1993 should be included in Mr. Prater's income. The insurance agency characterized these checks as loans from an advance premium account of CTI. Mr. Plemons and Mr. Prater conspired to have CTI backhaul checks deposited with PI. However, the evidence does not support respondent's position that all the diversions were income to Mr. Prater. Rather, CTI was credited with the funds on PI's books. Although Mr. Prater may have influenced who received the funds as loans from the CTI advance premium account, he repaid the funds he himself borrowed and with one exception did not personally benefit from the loans.

The record simply does not support a finding that Mr. Prater took dominion and control over all these funds for his own use or that he diverted all these funds to himself from CTI. Rather, while the funds were not shown on CTI's corporate accounting records, they were with one exception reflected as credited to CTI by PI.

Mr. Prater's actions were generally consistent with the treatment as advance premium payments by CTI and the subsequent checks being loans from the CTI credited account at PI. The exception to the treatment of funds as property of CTI is the $360,979.82 check to purchase a building in Dalton, Georgia, for the company Mr. Prater coowned with his stepson and PFW. This amount was the subject of a loan agreement Mr. Prater signed, but this loan was not repaid. The record does not support characterizing this amount as a loan Mr. Prater intended to repay. A similar check to buy real estate for a Gold's Gym was repaid by Mr. Prater, but according to his testimony the purchase of the building in Dalton for use as a carpet warehouse was for CTI's business. However, he had title to the building in Dalton placed with PFW. Despite his testimony, we find that Mr. Prater's arrangement of PFW as the building's owner was intentional.

Mr. Prater's business decisions were not haphazard but rather careful and calculated. He alone directed that funds in the CTI advance premium account at PI be used to buy property for a different entity in which he and his stepson held a controlling interest. Therefore, we find that respondent has established

that the check for $360,979.82 was income to Mr. Prater in 1993 but has failed to establish the other Schedule 1 amounts were Mr. Prater's income.

B.  Schedule 2 Adjustments--Other Transactions

The second phase of respondent's income adjustments includes (a) $3,000 and $10,000 of payments for furniture in 1992 and 1993, respectively, (b) four checks deposited in 1993 into PFW accounts or Mr. Prater's personal accounts totaling $22,000 which related to sales of CTI vehicles, and (c) a 1993 payment of $300,000 to a check-cashing business called Check-It-Out (CIO) which was made with CTI funds.

We will first address the $300,000 item.  Mr. Prater maintains this was a loan by CTI.  Whether the CIO payment was a loan or a payment to facilitate the conversion of CTI checks to cash, the payment was not made on behalf of Mr. Prater personally but rather for CTI.  Even if the payment was made for the illegal purpose of facilitating the concealment of CTI income, it was not paid for the primary benefit of Mr. Prater and thus is not his income.

The payments for furniture, however, were made on behalf of PFW, the business in which Mr. Prater had an interest with his stepson.  Respondent has also established a sufficient connection between the $22,000 of deposits and the proceeds of the sales of

vehicles to carry the burden of proving that these deposits were also income to Mr. Prater.  The record establishes that the vehicles were not Mr. Prater's property but rather belonged to CTI.  Two of the payments for vehicles were made to PFW accounts but were credited as paid-in capital of Mr. Prater.

Accordingly, the items apart from the $300,000 payment to CIO are income to Mr. Prater.

C.  Schedule 3 Adjustments--Deposits to PFW Accounts and Mr. Prater's Personal Account

The first group of deposits in respondent's last schedule of adjustments to income is $78,000.80 of CTI income checks which was deposited into Mr. Prater's personal account in 1991.  The record establishes the deposits of CTI checks were made to the personal account, and therefore we uphold this income adjustment.

Respondent also determined that a group of CTI-related checks totaling over $475,000 deposited into PFW accounts in 1992 and 1993 is Mr. Prater's income.  Respondent offsets these adjustments by roughly $5,000 in 1993 for deposit amounts not shown as paid-in capital to Mr. Prater in PFW.  However, the lion's share of respondent's adjustment in 1993 was not reflected as paid-in capital on the PFW books until many years after 1992 and 1993.  PFW had business relationships with CTI providing rental properties to CTI truckers and was often paid directly by

CTI.  Accordingly, we find that respondent has not carried the burden of proving that the items in question are Mr. Prater's income as opposed to the income of PFW.

V.  The Offset Claim

Mr. Prater established that CTI expenses in excess of respondent's income adjustments to Mr. Prater's income were paid during the years at issue in cash.  Through his representatives, Mr. Prater reasons that these cash payments should offset all of the income adjustments and he should prevail.  The record does not reflect, however, a loan or account receivable arrangement between CTI and Mr. Prater regarding the cash funds flowing between CTI and Mr. Prater; and because of the success of Mr. Prater's efforts to hide the flow of CTI's receipts converted to cash, there is not a specific record to track the source of the cash used to make the payments to drivers that are offered to support the claimed offsets.  Regardless of Mr. Prater's scheme to cause CTI receipts to be off the books and to be reduced to cash in his control, we do not accept that he is the source of all the cash payments for CTI.  We have presumed that CTI is a separate entity that must be respected in determining the amounts of income Mr. Prater received.  Likewise, Mr. Prater's calculated efforts to reduce CTI's unrecorded receipts to his unfettered control should not work to his advantage.  Accordingly, Mr.

Prater has failed to establish that the income adjustments sustained should be offset by the cash used to pay CTI's expenses.

VI.   <u>Whether the Civil Fraud Penalty Is Applicable</u>

Dealing in cash and hiding receipts are clearly badges of fraud, and it is difficult to imagine a record with greater evidence of such activities.  The income adjustments to Mr. Prater are among the CTI receipts he sought to shield from the IRS and other regulatory agencies.  The fact that he did not receive all of the unrecorded CTI receipts he caused to be converted to cash does not relieve him of the fraud penalty for the amounts he did receive or use for his personal benefit. Accordingly, Mr. Prater is subject to the fraud penalty for each of the years at issue.

VII.  <u>Mrs. Prater</u>

Mrs. Prater is jointly liable for the deficiencies in income tax which result from our analysis, but by agreement she is not liable for the fraud penalty.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.