T.C. Memo. 2016-185

UNITED STATES TAX COURT

RAMON REYNOSO, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8312-09.                    Filed October 4, 2016.

Ramon Reynoso, pro se.

<u>Andrew R. Moore</u>, <u>Patricia P. Davis</u>, and <u>Matthew Williams</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  This case is about a very successful chiropractor who used many different IDs to hide millions in bank deposits.  He didn't file tax returns for at least eight years; and when criminal investigators for the IRS showed up at his house with a search warrant, he offered up his wrists as if to be cuffed.  We concern ourselves not with his guilt, however, but only with the determination

**[*2]** of his gross receipts, deductions, and a series of penalties--the most significant of which depends on whether his failure to file was fraudulent.

FINDINGS OF FACT

I.   Ramon Reynoso

Dr. Ramon Reynoso is a self-employed chiropractor in Hayward, California. During 1997 through 2004--the years at issue--Dr. Reynoso was licensed in California, and was a qualified medical examiner for the state.  He was also an aggressive self-marketer--listed in the yellow pages when that meant something and a big spender on television and radio ads.  Most of the patients he attracted were victims of personal injury, and his income was almost entirely from insurance companies though he did receive some directly from at least one attorney who represented some of his patients.  Dr. Reynoso also bought and sold securities during the years at issue.

Until 1996 Dr. Reynoso reported his income on Forms 1040, but in 1997 he just stopped.  He admitted during trial that he did not file any tax returns for the 1997 through 2004 tax years.  His business, however, had impressive gross receipts for the years at issue.  High gross receipts without returns would ordinarily catch the Commissioner's attention, but Dr. Reynoso's money-management scheme was clever and for some time avoided scrutiny.

[*3] II.     How Dr. Reynoso Managed His Cashflow

Dr. Reynoso began his practice in 1991 as a sole proprietorship. In 2001 he incorporated it and renamed the business Dr. Ramon Reynoso Chiropractic Professional Corporation. He claimed during trial that during the transition-- January to May 2001--he was doing business as Ramon Reynoso, yet using the taxpayer identification number (TIN) from one of his trusts. What didn't change through the years is how Dr. Reynoso managed his cashflow.

After treating a patient, Dr. Reynoso would submit a claim to the appropriate insurance company--the same as any other provider in the industry. Dr. Reynoso received payments from multiple insurance companies during the years at issue. They include:

- ICW Group, Explorer Insurance;

- GAB Robins North America, Inc.;

- Sierra Insurance Group, CA Indemnity Insurance Co., Commercial Casualty Co.;

- Farmers Insurance Group;

- Zenith Insurance Co.;

- Wausau Insurance Cos.;

- Crawford & Co.;

- 4 -

[*4] • CNA;

• State Compensation Insurance Fund;

• Ward North America, Inc.;

• Athens;

• California State Automobile Association;

• Liberty Mutual Group; and

• Travelers Indemnity.

The manager of the special investigations unit at ICW Group credibly explained how Dr. Reynoso avoided detection by the Commissioner. First, an insurance company (or at least ICW, though we find it likely others are similar) gets a bill from a service provider that identifies who was treated. Once the insurance company checks the claim into the system, the bill is sent to a review committee. The committee checks only that the insurance company agreed to pay for whatever service is on the bill and sends an explanation of benefits to the patient; and the insurance company cuts a check to the provider--relying solely on the information provided on the practitioner's Form W-9, Request for Taxpayer Identification Number and Certification. The system is not on the lookout for red flags; if a provider puts the wrong information on the claim, the system won't catch it even if there are two tax identification numbers for the same claim and policy.

**[*5]**  Dr. Reynoso did just that:  He sent W-9s with false Social Security or TINs to insurance companies, and avoided detection for some time.  In some cases, the tax ID numbers were made to look like Social Security numbers but with one digit off.  He would also use multiple variations of his own name, or have Zeus Trust[1] bill on his behalf.  At one point, an investigator at Travelers Insurance reached out to Dr. Reynoso when he realized it didn't have a W-9 on file for him.  When Dr. Reynoso didn't respond, the investigator dropped a form off at his office.  There was no response.  Because it's not normal for a provider to be difficult about providing a W-9, the investigator examined Dr. Reynoso's corporation and realized that its charter had been suspended.

Dr. Reynoso avoided detection in another way too.  After he received proceeds from the insurance companies he deposited the money into his checking accounts at various banks.  When he opened these accounts, he didn't provide his real Social Security number.  When the balance in one of these account grew large enough, he transferred it.

---

[1]  Zeus Trust is one of a few trusts that Dr. Reynoso set up.  Dr. Reynoso organized it in 1997 with the help of an attorney.  Though it's unclear from the record what assets Dr. Reynoso put in Zeus Trust when he created it, he claims its only purpose was to conduct business.  Dr. Reynoso habitually billed insurance companies from Zeus Trust, though less frequently than he did from other EINs.

**[*6]** Dr. Reynoso organized the Tlaquepaque Family Trust (T.F. Trust) in 1997, the same day he created Zeus Trust. The documents related to T.F. Trust are incomplete. It seems, however, that Dr. Reynoso obtained a proper TIN for T.F. Trust, though he may have botched much of the rest of the paperwork. Dr. Reynoso claimed on an application to a broker that the T.F. Trust was an irrevocable trust, but the record shows that it was at best a grantor trust--if it's a trust at all. There is an affidavit in the record in which Dr. Reynoso swears he is the grantor of the trust, but while the document is notarized, the signature line is blank. And other than applying for a TIN, Dr. Reynoso didn't observe the formalities that typically come with owning an irrevocable trust such as, for example, filing any trust income tax returns for any of the years at issue. At trial Dr. Reynoso tried to persuade us that the T.F. Trust's purpose was to protect him somehow, but he was unable to provide any explanation as to *how* the trust would do that. We find that the only purpose behind the T.F. Trust was to move money.[2]

Starting in 1997, Dr. Reynoso used the T.F. Trust to open various brokerage accounts at E*Trade, TD Ameritrade, and Schwab. On the application for the Schwab account Dr. Reynoso notably listed the TIN for the T.F. Trust instead of

---

[2] With one exception--the T.F. Trust also owned a Mercedes that Dr. Reynoso bought sometime in 1999.

[*7] his SSN--which was what the application asked for.[3] He used the T.F. Trust to trade stocks and bonds and as a place to store money. Once he collected a certain amount of money in a bank account, he would move the money to the T.F. Trust via check. From there, Dr. Reynoso would use that money in his trading. But one way or another almost all of Dr. Reynoso's money would make its way into a brokerage account.

Dr. Reynoso did put some of his assets into the Mary S. Caballero Family Trust (Family Trust). The Family Trust was a grantor trust and appears to have a legitimate Federal TIN. But, like the paperwork for the other trusts, the paperwork for the Family Trust is incomplete. Dr. Reynoso organized the Family Trust in 2001 and claimed during trial that he is one of its trustees. He claimed (and from the evidence, we find it true) that he started the trust with a refund check from the Commissioner. While Dr. Reynoso did not use the Family Trust for billing, he did at one point move $50,997 from his Bank of America account into the Family Trust. He later moved the money to the T.F. Trust.

---

[3] The T.F. Trust's TIN was shown correctly elsewhere on the application. The applications for other brokerage accounts did not ask for that kind of information.

**[*8]** III.      Recordkeeping

Dr. Reynoso kept no track of his business receipts or expenses. He had neither an accountant nor a bookkeeper. And the search by IRS criminal investigators that began with Dr. Reynoso's presentation of his wrists found no business records at all. He claimed during trial that he kept a checkbook, and that he has receipts for his business expenses, but because there are "just so many of them" he could not be bothered to submit them as evidence in his own case.

It's a similar story with Dr. Reynoso's stock trades. While he did offer some brokerage statements into evidence, the records do not cover every year at issue and are incomplete. Dr. Reynoso also submitted spreadsheets that show an incredible, but sporadic, churn in his trading. He would sometimes make hundreds of trades in a single day and many hundreds of trades in a single month. What they don't show us, however, is Dr. Reynoso's net gains and losses. Rather, Dr. Reynoso's spreadsheets show us a tally of total purchases and sales for the year:

| Year | Bought | Sold | Net gain or loss |
|------|--------|------|------------------|
| 1997 | $17,946,776.94 | $16,390,380 | ($1,556,396.94) |
| 1998 | 45,583,086.05 | 45,048,209 | (534,877.05) |
| 1999 | 45,536,323.71 | 46,566,009 | 1,029,685.29 |

| | | | |
|---|---|---|---|
| **[*9]** 2000 | 85,956,744.42 | 83,270,467 | (2,686,277.42) |
| 2001 | 19,845,551.14 | 19,780,965 | (64,586.14) |
| 2002 | 25,469,075.42 | 24,652,495 | (816,580.42) |
| 2003 | 108,175,314.60 | 108,459,909 | 284,594.40 |
| 2004 | 217,789,364.91 | 217,001,644 | (787,720.91) |

He made no attempt to match the sale of a security with its purchase--data that would be necessary under section 1001 to determine his gain and make a mark-to-market election (but more on that later). His spreadsheets also do not account for purchases from earlier years of securities sold during the years at issue.

After trial the Commissioner tried to correctly compute Dr. Reynoso's net gains and losses, but we recognize that with such limited documentation, the attempt cannot be entirely accurate. But it does show how wildly off Dr. Reynoso's numbers are:

| Year | Net gain or loss | Year | Net gain or loss |
|---|---|---|---|
| 1997 | $164,679.42 | 2001 | $141,640.01 |
| 1998 | 739,557.49 | 2002 | 1,950.83 |
| 1999 | (57,548.08) | 2003 | No documents |
| 2000 | 1,005,460.00 | 2004 | (787,720.91) |

**[\*10]** IV.    Dr. Reynoso's Nonreporting

Dr. Reynoso admitted during trial that he did not file any individual tax returns for the 1997 to 2004 tax years.  His reason--at least his reason during trial-- was that his losses as a day trader exceeded his income and he "believed that a return was not necessary."  There is also no record of Dr. Reynoso's ever filing a corporate return for any of the 1990 to 2004 tax years, or for that matter any returns for any of his trusts, (Zeus Trust, T.F. Trust, and the Family Trust) for the years at issue.  (While Dr. Reynoso wouldn't have had to file a return for a grantor trust, sec. 671;[4] see also Gould v. Commissioner, 139 T.C. 418, 435 (2012), aff'd, 552 F. App'x 250 (4th Cir. 2014), he did claim at least once that the T.F. Trust was an irrevocable trust; if this were true, it should have filed a return, see, e.g., Kalapodis v. Commissioner, T.C. Memo. 2014-205 (no exception to general rule taxing irrevocable trust at trust level without proof of special provisions).[5]

---

[4]    All section references are to the Internal Revenue Code in effect for the years at issue, and all Rule reference are to the Tax Court Rules of Practice and Procedure.  Section 671 and the provisions that follow lay out the rules for when a taxpayer is treated as the owner of a trust.  See secs. 671-79.

[5]    See, e.g., Adams, "Irrevocable Life Insurance Trusts," 120 Tr. & Est. 6 (1981); Mulligan, "Sale to a Defective Grantor Trust:  An Alternative to a GRAT?," 23 Est. Plan. 3 (1996).

**[*11]** V.    <u>The Criminal Investigation</u>

Julie Ryer--a special agent with the IRS Criminal Investigation Division--began investigating Dr. Reynoso in 2003. Ryer subpoenaed Dr. Reynoso's bank records and contacted insurance companies for information about any payments they had made to him. The fruits of her initial investigation were enough for probable cause, and a district court authorized a search warrant for the 2000-2003 tax years on Dr. Reynoso's business and residence.

During the search Ryer and her team collected statements from banks, brokerages, and mortgage companies, as well as trust documents, credit-card statements, and blank IRS forms.[6] She found 1099s, separated and stacked by their year--many of them with incorrect Social Security numbers. She also found several tax-protester documents, books, magazines, and articles. One important thing Ryer and her fellow investigators did *not* find was any business records that showed Dr. Reynoso's annual income and expenses. Investigators at the scene did not consider any documents that fell outside the 2000-2003 tax years listed on the warrant. They also did not see any mark-to-market election paperwork. They seized all relevant documents and Dr. Reynoso's computers.

---

[6] Among the IRS Forms was a Form 941, Employer's Quarterly Federal Tax Return, filled out with all zeros--a common tax-protester practice. <u>See, e.g.</u>, <u>Coulton v. Commissioner</u>, T.C. Memo. 2005-199.

[*12] The evidence against him was damning, and in April 2008 Dr. Reynoso pleaded guilty to income tax evasion under section 7201, but only for the 2001 tax year. In his plea he agreed that he knowingly and willfully failed to file his income tax return for 2001 and that he made an affirmative attempt to evade and defeat the assessment and payment of income tax by placing assets into nominee accounts to conceal ownership of assets and receipt of income, and by opening bank accounts with false Social Security numbers.

VI.    The Notice of Deficiency

The Commissioner sent Dr. Reynoso a notice of deficiency for the 1997-2004 tax years after his criminal proceedings ended. The notice reflected the following increases in tax and penalties:

| Year | Deficiency | 6651(a)(2) | 6651(f) | 6654 |
|------|-----------|------------|---------|------|
| 1997 | $6,669,248 | $1,667,312.00 | $4,835,204.80 | $359,276.04 |
| 1998 | 17,979,419 | 4,494,854.75 | 12,035,078.78 | 816,793.37 |
| 1999 | 18,547,730 | 4,636,932.50 | 13,447,107.25 | 890,793.37 |
| 2000 | 33,129,226 | 8,280,362.25 | 24,013,050.53 | 1,781,382.42 |
| 2001 | 7,891,337 | 1,964,773.00 | 5,697,841.70 | 313,938.52 |
| 2002 | 9,845,652 | 2,458,472.50 | 7,129,570.25 | 328,577.86 |
| 2003 | 38,561,539 | 9,639,057.00 | 27,953,265.30 | 994,782.21 |
| 2004 | 78,741,687 | N/A | 57,087,723.08 | 2,256,504.99 |

[*13] Dr. Reynoso petitioned this Court, and we tried the case in San Francisco. Dr. Reynoso was a California resident when he filed his petition.

OPINION

There are three substantive issues in this case:

- Dr. Reynoso's gross income;

- his stock-trading income; and

- the correct amount of his business deductions.

Even though the parties here disagreed about the amount of Dr. Reynoso's income, there was no dispute that he made money through his practice. The Commissioner asserts that we should use his bank-deposits analysis to determine the amount of Dr. Reynoso's unreported gross receipts. Dr. Reynoso answers that, whatever gross receipts he had were offset by his stock-trading losses. The Commissioner replies, however, that Dr. Reynoso cannot offset his income with stock-trading losses because he didn't correctly calculate these losses, and that in any event section 1211(b) limits them to $3,000 per year. Dr. Reynoso then rejoins that the usual cap doesn't fit him because he made a mark-to-market election. He also argues that he is entitled to deductions greater than those already allowed by the Commissioner for the expenses of running his business during the years at issue.

**[\*14]** These three substantive issues are matched by the three penalties that the

Commissioner says that Dr. Reynoso owes:

- a fraudulent-failure-to-file penalty under section 6651(f);[7]

- a failure-to-timely-pay penalty under section 6651(a); and

- a penalty for failing to pay estimated tax under section 6654.

Beneath all six of these issues is the common ground of Dr. Reynoso's

credibility. And we must find that there is not much there. Here are just some

examples:

- Dr. Reynoso admitted during trial that he didn't file his tax returns because he didn't think he had to, but the substantial amount of tax-protester propaganda found in his home suggests otherwise.

- Dr. Reynoso claimed during trial that he didn't bring his business records to trial because of their vastness, but Ms. Ryer, the criminal investigator, credibly testified that she never saw any records whatsoever during the search of Dr. Reynoso's residence. On brief Dr. Reynoso changed his story and now accuses the criminal investigators of taking and losing his business records.

- Dr. Reynoso asserts that the misinformation on his 1099s and bank account records were mere typos. Believing this would require us to find that several insurance companies and large banks made multiple and similar typos rather than find that Dr.

---

[7] In the alternative, the Commissioner asserts that Dr. Reynoso is liable for a failure-to-timely-file penalty for each of the years at issue.

**[*15]** Reynoso submitted the incorrect information to those institutions.

- Dr. Reynoso insisted during trial that he created the T.F. Trust to protect himself, but could not offer up a single explanation as to *how* the trust would do so.

I.   The Substantive Issues

A.   Gross Income

Dr. Reynoso stipulated his gross receipts from his chiropractic business for some of the years at issue. He admits that he received payments from his chiropractic business for the 1997, 1998, 1999, and 2004 tax years of $448,785, $361,992, $290,319, and $920,652, respectively. But Dr. Reynoso wouldn't stipulate for the remaining years, and in the absence of adequate records, the Commissioner performed a bank-deposits analysis for the 2000, 2001, 2002, and 2003 tax years. The Commissioner often uses bank-deposits analyses to reconstruct taxpayers' income--and we have long approved their use. See Welch v. Commissioner, 204 F.3d 1228, 1230 (9th Cir. 2000), aff'g T.C. Memo. 1998-121; Factor v. Commissioner, 281 F.2d 100, 114-16 (9th Cir. 1960), aff'g T.C. Memo. 1958-94.

"Deposits in a taxpayer's bank account are *prima facie* evidence of income." Welch, 204 F.3d at 1230. The Commissioner does not have to show

**[*16]** that a deposit came from a certain source. Clayton v. Commissioner, 102 T.C. 632, 645 (1994). He must deduct from the total deposited moneys any income that the taxpayer reported and any nontaxable items. DiLeo v. Commissioner, 96 T.C. 858, 868 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992). The burden is on the taxpayer to show that the Commissioner's analysis is wrong. Rule 142(a); Welch, 204 F.3d at 1230. One way he could do this is by showing that a particular deposit came from a nontaxable source. Azimzadeh v. Commissioner, T.C. Memo. 2013-169.

A revenue agent in this case analyzed Dr. Reynoso's bank deposits during the criminal investigation. She examined each deposit, check, disbursement, and withdrawal, and debit memos for six bank accounts and two brokerage accounts. Dr. Reynoso didn't report any income during the years at issue, so there was nothing for her to subtract from her totals.

Dr. Reynoso argues that this analysis is "riddled with errors" and "not trustworthy," but he offers no evidence to prove his assertion. He does argue that a $50,000 transfer from the Family trust to the T.F. Trust should not be included because it was nontaxable. He explained during trial that the $50,000 was money he moved to the Family Trust temporarily from a bank account he was closing--he later transferred the sum back to himself by putting it in the T.F. Trust. But that

[*17] money was included in the analysis as a nonincome transfer. Dr. Reynoso also pointed to $100,000 frozen by California as part of a levy--he claims that when the levy was released, the Commissioner improperly included the amount twice. But the Commissioner did not include this in his total either. Dr. Reynoso also seemed to argue that a loan he took out was improperly included as taxable. He was, however, unsure of the amount of money lent to him and in which year he received it. He offers nothing but his own testimony to substantiate the existence of this loan, and we do not believe his uncorroborated testimony.

Dr. Reynoso did not contest any other deposits during trial or on brief. We therefore find that the revenue agent's bank-deposits analysis accurately reflected Dr. Reysoso's gross receipts for the 2000, 2001, 2002, and 2003 tax years. We find for the Commissioner on this issue.

B.    Stock-Trading Income

Dr. Reynoso next asserts that his stock trading produced losses that completely offset his gross receipts. The problem with that argument is that section 1211(b) limits his losses from trading securities to $3,000 a year. Dr. Reynoso therefore insists that he is in the trade or business of trading securities *and* that he made a mark-to-market election--thereby removing the limitation. See sec. 475(f).

**[*18]** Traders are those engaged in the trade or business of selling securities for their own account. See King v. Commissioner, 89 T.C. 445, 457-59 (1987); Kay v. Commissioner, T.C. Memo. 2011-159. Their expenses reduce adjusted gross income, which means traders get bigger breaks on their taxes. Kay, T.C. Memo. 2011-159. A trader without a mark-to-market election, however, is still limited to a $3,000 loss per year on his trades. See sec. 475(f).

We'll assume Dr. Reynoso was a trader.[8] Section 475(f) permits ordinary gain or loss treatment for securities only if a trader makes a mark-to-market election. Sec. 475(f)(1)(A); Perkins v. Commissioner, 129 T.C. 58, 68 (2007). Revenue Procedure 99-17, 1999-1 C.B. 503, outlines how to make a mark-to-market election: A taxpayer must make the election no later than the due date for the return for the year *before* the election year. Rev. Proc. 99-17, sec. 5.03; Perkins, 129 T.C. at 68. A taxpayer now does this by attaching a Form 3115, Application for Change in Accounting Method, to his tax return. Rev. Proc. 99-

---

[8] Though we are skeptical. For Dr. Reynoso to be considered a trader, his trading activity needed to be substantial, King, 89 T.C. at 458-59, and he didn't keep adequate records. A trader also typically relies on his trading activities as his primary source of income and does not have a full-time business like Dr. Reynoso's practice. See Kay, T.C. Memo. 2011-159; Chen v. Commissioner, T.C. Memo. 2004-132.

**[\*19]** 17, sec. 5.03; <u>Poppe v. Commissioner</u>, T.C. Memo. 2015-205, <u>Knish v. Commissioner</u>, T.C. Memo. 2006-268.

Dr. Reynoso's biggest problem is that we see little evidence that he made such an election. Despite his adamance during trial and in his briefing that he made it in 1997, we find it impossible for him to have done so. His first problem is that it's clear he didn't comprehend what mark-to-market meant. This is evident in the way he kept track of his trades. Dr. Reynoso merely tallied his total purchases and sales for each year--making no attempt to match a particular stock's sale or year-end price with its purchase. Under section 1001, the gain from the sale of property is the excess of the amount realized over the adjusted basis. To properly calculate his gain or loss, Dr. Reynoso needed to match each stock sale or year-end price to its purchase price. <u>See</u> sec. 1001. He didn't do this.

Then there is the problem with forms. Dr. Reynoso claims that he filed the appropriate mark-to-market forms, but that through no fault of his own, they were lost. He claimed during trial that when he got his documents back after the investigation they were in disarray, and on brief he accuses the government of losing them "when they raided him at gunpoint." The agents that searched his home, however, credibly testified that they didn't find a single document indicating that Dr. Reynoso ever made a mark-to-market election.

[*20] That's no surprise: Revenue Procedure 99-17 didn't come out until 1999. Before 1999 the IRS had no procedure for how to make a mark-to-market election. See Knish, T.C. Memo. 2006-268. To make an election for the 1997 tax year, as Dr. Reynoso insists he did, would have required a very sophisticated understanding of the Code. If it were the case that Dr. Reynoso had a sophisticated understanding of the Code, it would not be the case that he thought he didn't have to file his tax returns for eight years in a row. See sec. 6012(a). Even after the IRS released the Revenue Procedure, Dr. Reynoso still couldn't have made a mark-to-market election--he broke the rules when he didn't file his tax returns. See Rev. Proc. 99-17, sec. 5.03. And in any case, we reiterate, there is no proof that he ever made such an election.

Dr. Reynoso offers us nothing but his uncorroborated testimony that he made a mark-to-market election. That's not enough. See, e.g., Perkins, 129 T.C. at 68. For these reasons, we find that Dr. Reynoso did not during any year at issue make a mark-to-market election. We also find that he is not entitled to offset his income by any more than the $3,000 cap per year--and even that only to the extent that the Commissioner has determined that he had losses. We find for the Commissioner on this issue.

**[*21]** C.    Business Expense Deductions

Section 162 allows deductions for all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. During the criminal case the Commissioner determined Dr. Reynoso's allowable deductions by examining check and credit-card payments. In making her calculations, the revenue agent was lenient and treated all credit-card transactions as business-expense deductions even if the item could have been personal. So for the years 2000, 2001, 2002, and 2004 the Commissioner determined the following deductions from subpoenaed financial documents and credit-card statements collected in the search of Dr. Reynoso's home:

| Year | Amount |
| --- | --- |
| 2000 | $81,398 |
| 2001 | 158,299 |
| 2002 | 237,195 |
| 2004 | 134,901 |

For the other years at issue the Commissioner was unable to determine any business-expense deductions because Dr. Reynoso didn't provide check and credit-card statements. He also didn't bring any of those records to trial.

[*22] Dr. Reynoso argues that, although he is unable to reconstruct his business expenses, we can at least estimate his expenses. He proposes new numbers for each year at issue in accordance with national statistics for chiropractors' offices found on the Commissioner's own website. But Dr. Reynoso attached these statistics only to his brief and did not enter them into evidence. We therefore won't use them. See generally Rule 143; Bauer v. Commissioner, T.C. Memo. 2012-156 (estimating expenses from industry statistical reports introduced at trial); Pugh v. Commissioner, T.C. Memo. 1985-67, aff'd in part, 782 F.2d 1039 (5th Cir. 1986), and aff'd in part, 817 F.2d 755 (5th Cir. 1987). We are limited to the record before us. See Edelson v. Commissioner, 829 F.2d 828, 832 (9th Cir. 1987), aff'g T.C. Memo. 1986-223.

When a taxpayer claims business expenses that he cannot fully substantiate we may estimate the allowable amount, see Cohan v. Commissioner, 39 F.2d 540, 543-44 (2d Cir. 1930), but he must still provide at least some reasonable evidence that enables us to do so. The Commissioner argues here that because Dr. Reynoso provided no documentation to substantiate any expenses, we have no reasonable evidence and should not allow *any* expenses. We have no obligation to apply Cohan when a taxpayer doesn't cooperate with the Commissioner or the Tax Court. Buelow v. Commissioner, 970 F.2d 412, 415 (7th Cir. 1992), aff'g T.C.

**[\*23]** Memo. 1990-219; <u>Lerch v Commissioner</u>, 877 F.2d 624, 628-29 (7th Cir. 1989), <u>aff'g</u> T.C. Memo. 1987-295. We acknowledge that Dr. Reynoso must of course have had expenses for his business. But even though the Commissioner was able to extrapolate deductions from subpoenaed documents during the criminal investigation for some years,[9] Dr. Reynoso's utter lack of credibility, unwillingness to cooperate with the Commissioner, and lack of documentation for any of the other years renders us unable and unwilling to apply the <u>Cohan</u> rule. See <u>Edelson</u>, 829 F.2d at 832. We find for the Commissioner on this issue.

## II.    <u>Penalties</u>

### A.    <u>Fraudulent Failure to File</u>

The Commissioner asserts that Dr. Reynoso is liable for a section 6651(f) fraudulent-failure-to-file penalty for each year at issue. Because the assertion is

---

[9] Dr. Reynoso argues that he is entitled to deductions for the 1997, 1998, 1999, and 2003 tax years, and additionally argues that he is entitled to *greater* deductions than the Commissioner allowed for the remaining years. Dr. Reynoso however, did not provide any documentation to support his argument and we uphold the Commissioner's determinations for the 2000, 2001, 2002, and 2004 tax years. He also argues that he can't substantiate his expenses because the investigators returned his documents in such disarray. But as we pointed out earlier, the investigators found no business records to take (or return); and even though they did take credit-card statements, they took only those relevant to the years at issue during the criminal investigation. This means Dr. Reynoso cannot blame the Commissioner for his lack of records outside the years at issue during that investigation.

[*24] fraud, the burden swings to the Commissioner, who must prove by clear and convincing evidence Dr. Reynoso's failure to file was fraudulent. See sec. 7454(a); Rule 142(b); Clayton v. Commissioner, 102 T.C. at 646; Mohamed v. Commissioner, T.C. Memo. 2013-255. "Fraud is established by proving that a taxpayer intended to evade tax believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such tax." Clayton, 102 T.C. at 647.

For the 2001 tax year our job is easy--collateral estoppel applies: A judgment in a prior proceeding precludes litigation in a second proceeding as long as the issues and parties are the same. Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.5 (1979); Niedringhaus v. Commissioner, 99 T.C. 202, 213 (1992). It makes no difference that Dr. Reynoso's conviction under section 7201 was the result of a guilty plea and not a trial. See Anderson v. Commissioner, 698 F.3d 160, 164 (3d Cir. 2012), aff'g T.C. Memo. 2009-44; DiLeo, 96 T.C. at 886; Montalbano v. Commissioner, T.C. Memo. 2007-349, aff'd, 307 F. App'x 322 (11th Cir. 2009). And conviction for tax evasion under section 7201 requires proof of specific intent to defraud--the same element necessary for the civil-fraud penalty under section 6651(f). See Clayton, 102 T.C. at 653; Wallace v. Commissioner, T.C. Memo. 2000-49.

**[\*25]** So Dr. Reynoso is collaterally estopped from contesting that he fraudulently failed to file his 2001 tax return.[10] But what of the other years? This is an area of law that has become hyperprongified, so we'll list our usual badges of fraud, which include:

- understating income;

- maintaining inadequate records;

- implausible or inconsistent explanations of behavior;

- concealment of income or assets;

- failing to cooperate with tax authorities;

- engaging in illegal activities;

- an intent to mislead;

- lack of credibility of the taxpayer's testimony;

- filing false documents;

- failing to file tax returns; and

- dealing in cash.

Clayton, 102 T.C. at 647; Mohamed, T.C. Memo. 2013-255.

---

[10] Dr. Reynoso argues that he made his guilty plea under duress. He says he "simply wanted peace at any price." This argument lacks merit--any relief of this sort must be requested in an appeal or in a *habeas corpus* proceeding. See Fed. R. Crim. P. 11(e); see also Anderson v. Commissioner, T.C. Memo. 2009-44, aff'd, 698 F.3d 160 (3d Cir. 2012).

**[*26]** Several badges of fraud are also present for each of the remaining years. To start, Dr. Reynoso admitted during trial that he didn't file any tax returns for 1997-2004--that's at least eight years of nonfiling. While a pattern of nonfiling alone does not establish fraud *per se*, it is a strong indicator. Marsellus v. Commissioner, 544 F.2d 883, 885 (5th Cir. 1977), aff'g T.C. Memo. 1975-368. This is especially true in the case of someone like Dr. Reynoso, who used to file before he chose to stop. See Castillo v. Commissioner, 84 T.C. 405, 409 (1985). While Dr. Reynoso testified that it was his belief that he didn't have to file because his losses exceeded his income, we find his testimony incredible. See Huminski v. Commissioner, T.C. Memo. 2012-302. Like the taxpayer in Huminski, Dr. Reynoso did not simply misunderstand the law. Rather, Dr. Reynoso knew his legal duty to file his returns and pay any tax, but he sought to avoid it. See supra p. 10.

During 1997 through 2004, Dr. Reynoso did what he could to squirrel away his income from the Commissioner. He posted false Social Security numbers on his bank accounts to conceal assets during all those years at issue. See Simmons v. Commissioner, T.C. Memo. 2009-283. He says he didn't use false TINs or SSNs. But he stipulated that he opened at least two bank accounts under an incorrect Social Security number; and the relevant exhibits show signature cards

[*27] for those accounts reflecting incorrect taxpayer identification information. He also hid the income he got from insurance companies by giving them false TINs--for each of the years at issue he received payments under false TINs. After Dr. Reynoso received his income under false TINs and put it in bank accounts opened under false Social Security numbers, he would transfer large sums to the T.F. trust--removing them from the Commissioner's reach. Removing assets from the Commissioner's reach in such a way is another affirmative act of fraud. See Simmons v. Commissioner, T.C. Memo. 1997-269.

That should be enough to support a finding that the section 6651(f) penalty applies, but we'll list some more. Dealing in cash to avoid the Commissioner's scrutiny is another badge of fraud. Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), aff'g T.C. Memo. 1984-601; Temple v. Commissioner, T.C. Memo. 2000-337, aff'd, 62 F. App'x 605 (6th Cir. 2003). During at least the 2000 to 2003 tax years Dr. Reynoso made substantial cash transactions--cashing checks he received from an attorney at local banks instead of at his own. Dr. Reynoso claims he used the cash for business expenses, but was of course unable to substantiate that claim.

The best evidence here of Dr. Reynoso's intent to conceal, mislead or otherwise prevent the collection of tax is the affirmative steps he took to do so.

[*28] But, in addition to those, Dr. Reynoso did not maintain adequate business records. In fact, he did not maintain any records whatsoever. For the years involved in the criminal investigation, bank records and checks were subpoenaed from the financial institutions and not obtained from Dr. Reynoso. His lack of recordkeeping tends to indicate an intent to distort the calculation of his income and strongly indicates fraud. See Clayton, 102 T.C. at 647 (determining taxpayer failed to maintain records and even destroyed records because they would be evidence of his income).

For the reasons listed above, we find that the Commissioner has shown by clear and convincing evidence that Dr. Reynoso failed to file his required returns with the intent to conceal, mislead, or otherwise prevent the collection of tax for the 1997, 1998, 1999, 2000, 2001, 2002, 2003, and 2004 tax years.

B.    Failure To Timely Pay

The Commissioner determined that Dr. Reynoso is liable for a section 6651(a)(2) penalty for his failure to timely pay his 1997 through 2004 tax. The Commissioner prepared substitute returns under section 6020(b) for the years at issue that are in the record. The Code tells us to treat these returns as filed by the taxpayer to determine whether the section 6651(a)(2) penalty applies. Sec. 6651(g)(2); Wheeler v. Commissioner, 127 T.C. 200, 208-09 (2006), aff'd, 521

**[*29]** F.3d 1289 (10th Cir. 2008). We've already found that Dr. Reynoso willfully failed to file his return for each of those years, so he has no reasonable-cause defense to the section 6651(a)(2) penalty. We sustain this penalty.

C.     Failure To Make Estimated Tax Payments

We likewise sustain the Commissioner's assertion that a section 6654(a) addition to tax applies for the 1997 through 2004 tax years. Other than small amounts of withholding reported on his 1099, Dr. Reynoso willfully failed to pay any tax owing for the years at issue. He has no defense.

Decision will be entered

under Rule 155.